PURINTON & AL. *vs.* SEDGLEY & ALS.

A case of the construction of two deeds.

IN this case, which was trespass *quare clausum fregit*, both parties claimed title to the *locus in quo*; which was a parcel of flats, and a small border of upland, adjoining a larger parcel which formerly belonged to *Robert Sedgley*.

The plaintiffs derived their title under a deed made *Feb.* 2, 1797, by the heirs of *Robert Sedgley* to *Stephen Sedgley*, in which the land was described thus:—" beginning at the northeast corner of

a 3200 acre lot, No. 24, thence running a west-north-west course about two hundred poles, thence running southerly sixty seven poles,. thence running east-south-east about two hundred and six-teen poles, thence northerly sixty seven poles to the first mentioned bounds, containing about one hundred acres, more or less." The grantee entered under this deed, claiming the land ; and generally, but not every year, cutting the hay on the flats, till *Nov.* 17, 1809 ; after which he sold and conveyed the premises, including the whole of the upland and flats, to divers purchasers, from whom the whole estate of *Stephen Sedgley* therein came in 1824, by mesne conveyances, to the plaintiffs. The land was situated in this manner :—

Corner of the 3200 acre lot

W. N. W. 200 rods.

S. 22 1-2 W. 67 rods.

86 acres 16 rods.

Abagadasset river

one in 8 acres

Locus in quo

E. S. E. 216 rods.

26 rods.

The defendants, who were heirs of *Robert Sedgley,* proved that he died seised of a parcel of land which had been conveyed to him by *Nathaniel Jellison,* by deed dated *Nov.* 13, 1760, bounded thus :—" beginning on the westerly side of Abagadasset river, where the northerly line of a 3200-acre-lot No. 24 strikes said river, and running from thence a west-north-west course on said northerly line two hundred poles; then running a south-south-west course at right angles with said northerly line sixty seven poles, then running an east-south-east course, parallel with the northerly line aforesaid, about two hundred and sixteen poles, more or less, to Abagadasset river aforesaid; and from thence northerly on the water's edge to the northerly line of said tract No. 24, the first mentioned bounds ; being about 100 acres more or less."

They also proved an entry into the *locus in quo,* in 1804 and again in 1807 and 1810 by *Joseph Sedgley,* one of the defendants.

cutting the grass, and claiming title as heir to *Robert Sedgley* ; and that he exercised similar acts of ownership in some other subsequent years.

And they offered to prove that at the time of making the deed of *Feb.* 2,1797, the grantors expressly refused to give a deed conveying the whole lot sold by *Jellison*, which *Stephen Sedgley* was desirous to obtain ; and that the words " more or less to Abagadasset river, and from thence northerly on the water's edge to the northerly line of said tract No. 24," were agreed to be omitted in the deed, for the purpose of leaving the title to the flats and a small border of upland remaining in the grantors. But this evidence was rejected by *Preble J.* before whom the cause was tried ; and a verdict was returned for the plaintiffs, subject to the opinion of the court.

The question raised upon the construction of these deeds, was briefly spoken to at this term by *Allen*, for the plaintiffs, and *Orr*, for the defendants ; and the opinion of a majority of the court, *Weston J.* dissenting, was delivered at the ensuing *November* term in *Cumberland*, by the Chief Justice.

*Weston J.* The title of the plaintiffs to the *locus in quo* cannot be sustained upon the ground of disseisin ; inasmuch as their possession has not been uninterrupted ; the defendant, *Joseph Sedgley*, one of the heirs of *Robert Sedgley*, while his right to enter continued, if he had not conveyed it, having entered upon the premises and exercised acts of ownership over the same, at various periods, by which his seisin was continued, if he had a right to be seised. The plaintiffs must therefore depend upon the title which passed to *Stephen Sedgley*, by the deed executed to him by the heirs of *Robert Sedgley*, dated *February* 2,1797, all the land therein described having, through certain mesne conveyances, been transferred to the plaintiffs. The place of beginning in this deed is not in controversy. The land was to run thence, upon a west-north-west course, about two hundred poles ; thence southerly sixty seven poles ; thence, east-south-east, about two hundred and sixteen poles ; thence, northerly,

sixty seven poles, to the first mentioned bounds. It was proved that, measuring two hundred and sixteen rods from the west end of the tract conveyed to *Stephen Sedgley*, the *locus in quo* is excluded. Had there been a terminating monument referred to in the deed, the use of the term about, according to its ordinary import, would have implied, that the distance might, upon accurate admeasurement, exceed or fall short of the number of rods stated. Yet in that case, I am not aware that its use or omission would have any legal operation. If land is conveyed, running on a certain course, a certain number of rods, from one monument to another, it is a well settled principle that the land will extend to the monument described, whether it accords or not with the length of line. In stating also the number of acres conveyed, it is usual to represent it as about so many ; yet the word, about, although it negatives the conclusion that entire precision is intended, is without any legal operation whatever. In these cases, it is properly used, and carries with it a meaning readily understood ; as do many other words, which do not vary, in legal construction, the extent of the premises conveyed. If this word then, when properly used, is without legal effect, I cannot consider it as having any influence in this deed where, no fixed terminating point being stated, it appears to be used improperly, and without definite meaning. Rejecting this word as legally inoperative, there remains only the distance given ; and there is certainly nothing in the deed to lessen or extend it. It seems to me therefore to be very clear that, upon any sound construction, the *locus in quo* is not included in this deed taken by itself ; nor can I perceive that the facts present any latent ambiguity, which cannot be consistently explained without including it. The southerly line of the land conveyed to *Stephen Sedgley*, located according to the terms of the deed, does not extend to *Abagadasset* river, to which the grantors in that deed had title; but no ambiguity arises from this fact ; the grantors did not profess to convey all the land they had there ; nor have they referred to any other deed or description, than that which they have expressly given.

The deed being perfect in itself; there being no difficulty, upon legal principles, in locating the land according to the boundaries given, and no other instrument being referred to, it does not appear to me that the tract conveyed can legally be enlarged by adverting to the deed or title, under which *Robert Sedgley* held; or that it can properly be resorted to for this purpose. And if it could, I am unable to draw any deduction from it which would change the result derived from the terms of the second deed.

The deed of *November* thirteenth, 1760, from *Nathaniel Jellison* to *Robert Sedgley*, is very explicit in its terms. The southerly line extends to *Abagadasset* river, and the easterly line, by the water's edge to the point of beginning; about which there is no dispute. This important part of the description is omitted in the second deed. If the person who drew the second, had the first deed before him, I cannot account for the omission, but by supposing that it was understood that the two hundred and six teen poles would not, or might not, extend to the river, and that it was intended that the southerly line should be restricted to the number of poles stated. It is true that, upon this hypothesis, the term, about, is not only without legal effect, but without meaning. I do not deem it necessary, in the decision of this cause to account for its insertion; but it being found in the first deed, it might have been transcribed therefrom, without adverting to the impropriety of its use; the river, the terminating boundary in the first deed, not being given in the second; being there, as I apprehend, omitted by design.

If this line, in the deed under which the plaintiffs claim, was intended to run to the river, I do not understand why the closing line should not have been described as running by the water's edge, as it is in the deed made by *Jellison.* In the second deed, it is represented as running northerly. Whether this is to be regarded as a due north course, or whether to strike the point begun at, it diverges somewhat therefrom, it carries the idea of a straight line, no intermediate points being given; whereas a river rarely runs a distance of sixty seven rods, without sinuosities or indentations in its course. In the first deed, the parallel

side lines were to be distant from each other, at right angles, sixty seven rods ; but the parties seem to have been aware that if the river was not at right angles with the side lines, or if it pursued a meandering course, the distance measured by the water's edge would be greater than if measured at right angles ; hence, although the other three lines are represented as running a certain number of rods, the length of the closing line, running by the water's edge, is not given. It was as easy to write "northerly, by the water's edge, to the first mentioned bounds," as to write "northerly, sixty seven poles, to the first mentioned bounds ;" the change of language is not then, in this instance, to be accounted for by supposing it to have been done for the sake of abbreviation. Upon comparing the two deeds, therefore, I am so far from being satisfied that precisely the same tract of land was intended to be conveyed in both, that I am the rather led to infer, from the differences existing in the description, that it was understood that the second deed did, or might, convey less than the first. In both deeds, the quantity is stated to be about one hundred acres, more or less. There is so little precision in these terms, and they are so well understood to be uncertain and indefinite, that I cannot regard them as having any effect in the construction.

If possession had gone according to the plaintiff's claim, and the parties had uniformly acquiesced in their construction, they would have presented a case entitled to favourable consideration, had the extent of their right as deduced from the deed, under which they hold, been susceptible of doubt ; but this construction has been disputed and contested, and claims and rights adverse to it, on the part of one of the defendants, asserted.

The parol testimony, as to the conversation which passed between the parties, at the time of the execution of the second deed, I have no doubt was properly rejected by the judge who presided at the trial ; but upon the evidence received, I am of opinion that a verdict should have been directed for the defendant; and that, therefore, the verdict for the plaintiff ought to be set aside, and a new trial granted.

Purinton & al. *v.* Sedgley & als.

MELLEN C. J. The only serious question in this cause arises upon the construction of the deed from the heirs of *Robert Sedgley,* to *Stephen Sedgley,* bearing date *Feb.* 2, 1797; and is whether it must or ought to be so construed as to convey the same piece of land which was conveyed by *Nathaniel Jellison* to *Robert Sedgley* bearing date *November* 13, 1760. If both those deeds are in law to be considered as conveying the same piece of land, then the verdict is right, and the plaintiff is entitled to judgment; for there can be no ground for questioning the correctness of the decision, rejecting the parol evidence, by which the defendant offered to prove what the parties intended should be included in and conveyed by the deed of *Feb* 2, 1797. There are several particulars in which there is a perfect agreement in the description of the tract conveyed ; and several in which such an agreement is not expressed. The intention of the parties to the latter deed must be gathered from all the language employed in the description of the land, and its contents and boundaries. The first deed begins "on the westerly side of *Abagadasset* river, where the northerly line of a 3200 acre lot 24 strikes said river." The second deed begins " at the north-east corner of a 3200 acre lot 24," making no mention of *Abagadasset* river ; but both parties admit that the place of beginning in both deeds is the same. The first course in the first deed is in these words;—" and running from thence a west-north-west course, on said northerly line, two hundred poles." The first course in the second deed is in these words;—"thence running a west-north-west course about two hundred poles" ; making no mention of the northerly line of the 3200 acre lot 24. The second course in the first deed is in these words; " then running a south-south-west course, at right angles with " said northerly line, sixty seven poles." The second course in the second deed is in these words;—" thence running southerly sixty seven poles." The third course in the first deed is in these words ;—" then running an east-south-east course, parallel with the northerly line aforesaid, about two hundred and sixteen poles, more or less, to *Abagadasset* river aforesaid." The third course in the second deed is in these words ; thence running east-south-east about two hundred and sixteen poles;"—making no mention of

a parallel line, or of Abagadasset river. The fourth course in the first deed is in these words ;—" and from thence northerly on the water's edge, to the northerly line of said tract No. 24, the first mentioned bounds." The fourth course in the second deed is in these words ;—" thence northerly sixty seven poles to the first mentioned bounds ;"—making no mention of the water's edge. Each deed describes the tract containing "about one hundred acres more or less, and as a matter of fact the whole tract contains only 92 1-2 acres. The question is, considering all these descriptive expressions, whether the third course or line in the second deed, shall be construed to extend to *Abagadasset* river ; if not, it will not include the *locus in quo*. It is certainly a general rule that when no monument is named and exists at the end of a given line or course, then the length of line must govern ; and at the end of such line the measure must stop. The question is whether the facts in this case are such as to render the rule inapplicable in the present instance, by shewing that such was not the intention of the parties. By reading the second deed, and attending to courses and distances, it would seem as though the scrivener must have had reference to the courses and distances mentioned in the first deed and several of the monuments; and it seems equally clear that the person who drew the second deed, was disposed to abbreviate the description, as much as he could consistently, and without introducing what he might consider as uncertainty. It seems plain also that the second deed was not written pursuant to any actual survey or running of lines at that time ; the use of the word "about" in the first and third line or course of the word "southerly," not south-south-west as in the first deed in the second course; and of the word "northerly" in the fourth line or course; and the words "about one hundred acres more or less," would all probably have been omitted, or other more definite expressions substituted, had the deed been drawn according to a surveyor's minutes, made at the time and for the purpose. Supposing the second deed, then, to have been drawn from a general regard to the boundaries, courses, distances and contents of the tract well known in the family ; and noticing the many abbreviations in the description in this deed, appearing not to

have been deemed essential, we may be aided in giving the proper construction to the language employed by the grantor to convey his meaning. Now it is worthy of particular notice that in both deeds all the four courses are the same, except a slight variance as to the second ; and in both deeds, the distances given are the same on the first, second and third lines or courses ; and, as has been before remarked, the estimated contents of the tract are the same in both deeds. The only variance of any importance consists in the omission of some parts of the description in the second deed, which are found in the first.

The point chiefly relied on by the counsel for the defendants is that the third line is not described as running " to *Abagadasset* river aforesaid," nor the fourth as running by the "water's edge," as well as northerly to the first mentioned bounds. But we must again notice that in the beginning of the description, nothing is said about *Abagadasset* river, in the second deed, though that is a part of the description of the place of beginning in the first deed ; and yet the place of beginning is agreed. Does not the omission of the river in this first instance, shew that its omission in the third line was not deemed of any more importance than the other ? And it is acknowledged to be of no importance there. As, by the former deed, the third line of 216 poles was said and supposed to extend to the river, may not its omission be accounted for upon the same grounds, as that of several other descriptive particulars found in the first deed ? Again, the word "about," in the third line or course, is not without its meaning. It is said that a line "about" 216 poles long, no monument being referred to, means 216 poles. Admit this, as a general proposition, to be correct ; yet, in connection with the several other circumstances above mentioned, the word may have been, and probably was used, because the exact distance from or to the river was not known when either deed was written ; whereas, if the intention of the grantor had been, at all events, that the third line or course should stop at the end of the 216 rods, the word "about" was not only superfluous, but improper and deceptive. The second course in the second deed is "southerly." In the first deed, as already mentioned, it is south-south-west. Yet while the lat-

ter is the true course, it is admitted that, agreeably to the intentions of the heirs, both descriptions mean the same; and that the lines coincide and are conterminous ; whereas, if the deed from the heirs is to be considered independently of the deed to their ancestor, the courses are not only different, but the second line will not reach what is admitted to be the true third line, by more than five rods, and will also, at the point of termination, fall more than twenty five rods easterly of what is admitted to be the true boundary. Beyond all this, the supposed quantity is expressed in the very same words in both deeds, and that quantity is conveyed by both. It is often to be lamented that those who are making a contract will not always give themselves the trouble to be explicit ; and thus avoid controversy and expense. One or two words, added to the deed in question, would have rendered it too clear to admit of doubt as to the intention of the grantor. But we must decide upon the language of it as we have it ; and we find, in examining the deed, more expressions, and more reasons, leading to the conclusion that both deeds were intended to convey the same tract of land, than we find for drawing the contrary conclusion. And after a very attentive consideration of the cause, and arguments of the counsel, it is the opinion of a majority of the court, that the plaintiff is entitled to judgment.    Accordingly let there be                                      *Judgment on the verdict.*