WATKINS et al. v. KING.

(Circuit Court of Appeals, Fourth Circuit.  November 6, 1902.)

No. 365.

1. CIRCUIT COURT OF APPEALS—JURISDICTION—CONSTITUTIONAL QUESTION.
    The fact that a question as to the construction or application of the constitution of the United States arises incidentally in the trial of an action in a circuit court, as upon objection to the admission in evidence of an act of a state legislature as a muniment of title, on the ground that it was in contravention of the constitution, does not deprive the circuit court of appeals of jurisdiction to review the whole case on a writ of error.

2. BOUNDARIES—LOCATION OF LINES—QUESTION FOR JURY.
    The question of the location of a boundary line is one of fact, and where the evidence is contradictory, or where reasonable minds might draw different conclusions from undisputed facts shown, such question should be submitted to the jury.

3. SAME—EVIDENCE TO RELOCATE SURVEY—CONFLICTING CALLS.
    Under the settled rule that calls in a survey for natural objects must control both course and distance, it is error for a court to charge a jury to ignore such calls, as having been made through ignorance or mistake, and to be governed by courses and distances, because the objects called for are not found on the courses or at the distances called for, where there is evidence tending to show that the objects exist, and to identify them sufficiently to justify a finding that they were those seen and called for by the surveyor, however much they may be at variance with the courses and distances called for; nor is such charge justified by the further fact that such a finding would make the quantity of land embraced within the survey much smaller than that stated.

In Error to the Circuit Court of the United States for the Western District of Virginia.

R. R. Henry, Z. T. Vinson, and William E. Burns (John A. Sheppard, Maurice Belknap, and J. Randolph Henry, on the brief), for plaintiffs in error.

Maynard F. Stiles and S. L. Flournoy, for defendant in error.

Before GOFF and SIMONTON, Circuit Judges, and PURNELL, District Judge.

GOFF, Circuit Judge.  In August, 1894, the defendant in error instituted an action of ejectment in the circuit court of the United States for the Western district of Virginia against the plaintiffs in error and sundry other defendants,—73 in number,—which was tried in September, 1899, as to these plaintiffs in error and one Eli Hurley, who severed from the other defendants, the result being a verdict and judgment for the plaintiff below.  98 Fed. 913.  The land described in the declaration is alleged to be that portion of a tract of 500,000 acres now located in the state of Virginia, granted by the commonwealth of Virginia to Robert Morris by patent dated June 23, 1795, described in the grant as lying in the counties of Wythe and Rus-

¶ 1. Federal jurisdiction in cases involving federal questions, see note to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore Purchasing Co. v. Boston & M. C. C. & S. Min. Co., 35 C. C. A. 7.

¶ 3. See Boundaries, vol. 8, Cent. Dig. § 12.

sell, and now claimed by the defendant in error to be located in the counties of Buchanan, in Virginia, Logan, Mingo, Wyoming, and McDowell, in the state of West Virginia, and Pike, in the state of Kentucky. The plaintiffs in error claim portions of the land under junior patents issued by the commonwealth of Virginia. During the trial the defendants reserved many exceptions to the ruling of the court, which were made the basis of a large number of assignments of error. Some of these objections go to the defendant in error's title, but principally they refer to the instructions, either given or refused, and to the testimony relating to the location of the boundaries of the Morris patent.

Robert Morris on the 16th of November, 1795, conveyed the land so granted to him to one James Swan. In 1815 the title became vested in the "literary fund" of the state of Virginia, because of taxes thereon delinquent for the years 1812 to 1815, charged against said land in the name of Swan. The legislature of Virginia, by an act passed March 15, 1838, vested the title to said forfeited land in John Peter Dumas, trustee, in trust for the benefit of the creditors of Swan, with power to sell. Such trustee died without having closed the business of the Swan estate relating to said land, and on the 1st day of June, 1855, by an order entered in the chancery cause of Dumas v. Mosignon, then pending in the circuit court of Kanawha county, in the state of Virginia, one Josiah Randall was appointed trustee in lieu of Dumas, and a commissioner was appointed to convey to him such title as had passed to Dumas' heirs by his death, which was accordingly done. In the year 1866, Josiah Randall died, and thereafter, on October 3, 1866, in the last-mentioned chancery cause, an order was entered appointing Robert E. Randall as trustee in the place of Josiah Randall, deceased. By a decree entered in the circuit court of Kanawha county in said cause, the heirs of Josiah Randall were required to convey to Robert E. Randall, trustee, such title to the trust estate as descended to them upon the death of Josiah Randall; and a commissioner was appointed to make such transfer, which was accordingly done. Thereafter Samuel L. M. Barlow, who had intervened in said cause, duly removed the same to the United States district court for the district of West Virginia,—that court then exercising circuit court powers; and thereafter, Robert E. Randall having resigned as such trustee, John R. Reed was appointed his successor by order duly entered in that cause; and, he thereafter having sold the land to one David W. Armstrong, another order was entered on August 20, 1891, approving such sale, after which Armstrong assigned his purchase to John V. Le Moyne; and subsequently thereto Reed, as such trustee, and Armstrong, as such purchaser, by deed dated September 29, 1891, conveyed the land to Le Moyne, who, by deed of December 27, 1893, conveyed it to the plaintiff below. The title as thus described was duly offered in evidence by said plaintiff, when all of it except the patent was objected to upon various grounds by the defendants, which objections were overruled, on which action of the court many of the exceptions taken by the defendants below were founded.

The plaintiff below, after offering in evidence the grant for the 500,-

ooo-acre tract, also introduced, as explanatory of the same, copies of the survey and plat upon which it purported to have been made, and of the entries upon which it was based, and also copies of the patents, surveys, and entries of two earlier grants for 320,000 acres and 480,000 acres, respectively, lying to the eastward thereof, and called for as two of the boundaries of the grant under which he claimed. The following map, made by the official surveyor, is said to represent the locality of the grant according to an actual survey, the plaintiff insisting that the Morris grant should be located as shown by the exterior lines, A, P, H, I, J, M, A; and the defendants claiming that, if A and P are established as corners of the same, then the true location will be represented by the letters A, P, Q2, ZZ, MO, M2, and A.

The grant under which the plaintiff below claimed title to the land in controversy reads as follows:

"Robert Brooke, Esq., Governor of the Commonwealth of Virginia.

"To All to Whom These Presents shall Come, Greeting: Knew ye, that by virtue of eleven land office treasury warrants, Nos. 652, 653, 654, 655, 658, 659, 643, 645, 647, 648, and issued the 28th day of August, one thousand seven hundred and ninety-four, and No. 619, and issued 18th September, 1794, there is granted by the said commonwealth unto Robert Morris, assignee of Wilson Cary Nicholas, a certain tract or parcel of land, containing 500,000 acres, by survey, bearing date the 28th day of October, 1794, lying and being in the counties of Wythe and Russell, the greater part thereof in the former, on Sandy and Guyandotte rivers, and the waters thereof, and is bounded as follows, to wit: Beginning at two poplars and two chestnut trees on a branch of Guyandotte river, and about six miles from the mouth of Little War creek, a branch of Sandy river, being a corner of a survey of the said Nicholas of 480,000 acres, and a survey of 320,000 acres made for said Nicholas and Jacob Kenney, and with a line of the latter, S., 33 degrees W., 6,720 poles, crossing a dividing ridge, and down War creek to the mouth, crossing Sandy river at six miles, crossing Panther creek at nine miles, and crossing several ridges to four white oaks on the northwest bank of Knox creek, and thence leaving said survey, W. 3,840 poles, crossing a creek and some of the branches thereof, and along the spurs of the ridge dividing the waters of the said creek and Peters creek, a branch of Sandy river, to three poplars and a sugar tree by a small branch of Knox creek; thence N. 8,000 poles, crossing Knox creek at about four miles, Sandy river at twelve miles, the mouth of Turkey creek, and up said creek and the northwest forks of the same, crossing Buffalo creek and Pigeon creek, and the dividing ridge between Sandy and Guyandotte rivers, and Gilbert creek twice, a branch of Guyandotte, to three sugar trees in a bottom of said river, and about 20 poles below the mouth of Gilbert's creek, and thence N., 10 degrees, E., 4,450 poles, crossing Guyandotte river, several branches and some ridges, to pointers; then E., 6,620 poles, crossing Guyandotte river and several branches thereof to three sugar trees and buckeye by a small branch of the same, being the northwest corner of a survey of said Nicholas of 480,000 acres; thence with the same S. 6,800 poles, crossing Huff's or Cain creek, to the beginning. But it is always to be understood that the survey upon which this grant is founded includes 4,000 acres, which having a preference by law to the warrants and rights upon which Robert Morris survey is founded, liberty is reserved that the said 4,000 shall be firm and valid, and shall have the same effect, and may be carried into grant or grants; and this grant shall be no bar, either in law or equity, to the confirmation of the title before mentioned and reserved, with its appurtenances. To have and to hold, the said tract or parcel of land, with its appurtenances, to the said Robert Morris and his heirs, forever. In witness whereof, the said Robert Brooke, Esq., governor of the commonwealth of Virginia, hath hereunto set his hand, and caused the lesser

seal of the said commonwealth to be affixed, at Richmond, on the 23rd day of June in the year of our Lord 1795, and of the commonwealth the 19th.

"Book 31, page 613.

"[Seal.] ·                                                       Robert Brooke,
"Land Office, Richmond, Va."

The plaintiff below, by the witness W. D. Sells, offered testimony tending to prove that at the beginning corner, A, he found the corner trees called for in the three grants referred to, marked to correspond with the lines of the 320,000-acre grant; that he ran the first call of the Morris grant (which is coincident with a line of the 320,000-acre grant on its course to the point P on the map) to the locality on the northwest bank of Knox creek, where the trees called for as the common corner of the 500,000 and the 320,000 acre tracts were alleged to have stood; that from said point he ran the next line west 3,840 poles to the course and distance called for in the grant, with proper variations, to the point on the map designated H; that he then returned to the point A, and from it ran the eighth line of the 480,000-acre tract, the same being the last line of the 500,000-acre tract, north 6,800 poles to M on the map, a distance of 24¼ miles; that he projected the third line of the grant from the point H, through Pike county, Ky., to where it struck Tug river, picking up the line at that point, and extending it, by actual survey, upon the course and for the distance called for in the grant from H, north 8,000 poles, to I, from which point he ran the next call of the grant north 10 degrees, east 4,450 poles, to J; and that he then ran the next line with such variations as to make it close at the point M, which was the northwest corner of the 480,000-acre grant. The lines thus run, and concerning which said witness so testified, are said by the defendant in error to be the boundaries of the 500,000-acre grant under which he claims. The plaintiff below also introduced the evidence of Daniel Harman, a surveyor, who testified that he had known the 320,000-acre tract since the year 1842; that he had surveyed it two or three times; his evidence tending to prove that some of the corner trees called for at the points A and P on the map, as well as the marks thereon, had been found as called for in the 320,000-acre grant. The 500,000-acre grant mentioned certain creeks as being located along the boundary lines thereof, but they were not found on such lines as they were run by Surveyor Sells; and the plaintiff below, for the purpose of showing that the creeks called for in the grant as "Turkey" and "Gilbert" are not the streams now known by such names, introduced several witnesses whose testimony tended to show that, according to tradition, the creek shown on the trial map as "Turkey Creek" received that name after the date of the Morris grant, and that Thacker creek had been called "Turkey Creek" in early days; also that Gilbert creek had been known by the name of "War Creek" in former times, both before and since the date of said grant, and that Island creek had formerly been called "Gilbert Creek." On this point the defendants below introduced witnesses in contradiction of such reputation and tradition, and also for the purpose of impeaching the reputation for truth and veracity of the witnesses testifying in that regard in behalf of the plaintiff below.

The defendants below offered testimony tending to prove that the first line of the Morris grant should run from the point A on said map to the point P; that the line north 6,800 poles from A should stop south of the Guyandotte river at the point M2 on the map, instead of running the patent distance to the point M; that if the point A is the true beginning corner, and the point P an established corner of said Morris grant, then the second line of said grant, to wit, west 3,840 poles, should end at the point Q2, by a small branch of Knox creek, and not be extended to the point H, as contended for by the plaintiff below; that the third line would then be found by running from the point Q2 through the mouth of Turkey creek to the point ZZ at the mouth of Gilbert creek; that the fourth line would then run its patent course and distance from ZZ to MO; and that the survey should then be closed by running south 13½ east to M2, the line called for in the grant as east 6,620 poles. The defendants below also introduced as a witness N. L. Reynolds, a surveyor, who in 1884 had surveyed the lines represented on the trial map by the letters A to M2, A to P, P to a point between Q2 and H, ZZ to MO, and part of the line between ZZ and Q2, as also a portion of Turkey creek. They then introduced a surveyor, T. J. Mathews, who had run the lines from A north to the Guyandotte river, from A to P, from P westward on the line PQ2, and a line from ZZ, the mouth of Gilbert creek, to the mouth of Turkey creek. The defendants also offered the testimony of three surveyors, namely, Sells, Reynolds, and Mathews, tending to prove that James Taylor, who made the survey of the Morris 500,000-acre tract in 1794, had actually located the corner called for on a branch of Knox creek, and that he had also marked as a corner the mouth of Gilbert creek, near the point ZZ, fixing the line by the call for the mouth of Turkey creek; that he had located the corner called for on a branch of Knox creek at the point Q2, and that the fact that he, in his survey, had called for certain timber at the end of the line west from P, would indicate that he was at that point; that on the third line of the survey, on the location contended for by the plaintiff below, the only monuments called for by Taylor that were found were Sandy river and Pigeon creek, while on the line Q2, ZZ, the following monuments called for in the original survey and in the grant were found, to wit: Knox creek, Sandy river, the mouth of Turkey creek, the Northwestern Fork of Turkey creek, the dividing ridge between Sandy and Guyandotte rivers, Gilbert creek, the mouth of Gilbert creek, and Guyandotte river, and three marked sugar trees about 20 poles below the mouth of Gilbert creek; that the fact that Taylor, in his survey, called for three sugar trees, 20 poles below the mouth of Gilbert creek, in a bottom, would indicate that Taylor was also at that point, which is ZZ on the map; that the designation of special trees would also indicate that he was at the point MT, and that Taylor knew the location of those points; that, in his opinion as a surveyor, Taylor was in fact at the corner on Gilbert creek; that he was on Turkey creek, and also on Knox creek; that the course called for by Taylor from the different corners of his survey was generally correct, looking from the corner designated; that the land embraced in the Morris grant was located

in Wythe and Russell counties, Va., and that no part of the same was supposed to be in the state of Kentucky, in which state about 25,000 acres must be sought for, if the lines of the grant as contended for by the plaintiff below should be established; that the surveys made by Taylor, exceeding in the aggregate a million acres of land in the locality of the Morris grant, were generally incorrect, so far as course and distance were concerned, the lines falling short in some instances from one-third to one-half, thereby reducing greatly the acreage involved; that T. J. Mathews, who surveyed the Morris grant under the direction of the United States circuit court for the district of West Virginia, and N. L. Reynolds, who surveyed it for Robert E. Randall, trustee, under whom the plaintiff below claims, both located the boundary lines thereof, as shown by the points A, P, Q2, ZZ, MO, OM2, and M2A, and that the official surveyor, Sells, in running the line from A, stopped at the point P at the instance and request of plaintiff's counsel; that he extended the line PH to the point H also at their request; and that other points, such as I, J, and N, were located by him, not by course and distance or monuments, but by direction of the plaintiff's counsel.

Considerable testimony was offered by the defendants tending to show title in them to the land in controversy, as also their possession and occupancy of portions of the same; but a full statement of such testimony will not be necessary to either the proper disposition or understanding of the case, as we find it our duty to dispose of the questions involved by remanding the cause for errors found in the court's instruction to the jury relating to the boundary of the plaintiff's grant.

At the conclusion of the evidence, the court gave to the jury, on behalf of the plaintiff, five instructions, to the first four of which the defendants objected and excepted. The defendants requested the court to instruct the jury in their behalf in thirty-eight instructions, the first six of which the court gave. The rest were refused, to which action of the court the defendants excepted. The first instruction given on behalf of the plaintiff below was a peremptory direction as to the location of the Morris grant, and was in effect a direction to the jury to return a verdict against the defendants. Thereupon the jury found a verdict for the plaintiff. The defendants moved for a new trial, which was refused, when a judgment was duly entered in accordance with said verdict. This writ of error was allowed March 29, 1900.

The defendant in error on the 26th day of November, 1900, filed a motion to dismiss the writ of error for the reason that it appears upon the record of this case that the law of a state, to wit, the act of the legislature of Virginia passed March 15, 1838, is in contravention of the constitution of the United States, and that therefore the case involves the construction and application of the constitution of the United States, the effect of which would be to deprive this court of jurisdiction, so far as the questions raised by this writ of error are concerned. This motion is first to be disposed of.

The plaintiff below offered in evidence, as a part of his chain of title, a statute of the state of Virginia vesting the title to the land in

Dumas, trustee, under whose successor in trust he claims, when the defendants below objected to the reception of that legislation as evidence for the reason that "said act is in contravention of the constitution of the United States"; that it "is class legislation, granting special privileges to said trustee not conferred or granted to others"; and also because it "undertakes to deprive persons of property without due process of law." It is now insisted that these objections involve the construction or application of the constitution of the United States, which prohibits class legislation, and prevents a state from depriving a person of his property without due process of law, and that therefore the supreme court of the United States is the only tribunal that can dispose of this controversy. The claim is now made that, under the act of congress creating and defining the jurisdiction of the circuit courts of appeals, all questions involving the construction or application of the constitution of the United States, and any case in which the constitution or law of a state is said to be in contravention of the constitution of the United States, shall be removed from the circuit or district courts, by appeal or writ of error, to the supreme court of the United States.

In the case of Green v. Mills, 16 C. C. A. 521, 69 Fed. 852, 30 L. R. A. 90, this court, speaking through Chief Justice Fuller, said:

"It was early held, in McLish v. Roff, 141 U. S. 661, 12 Sup. Ct. 118, 35 L. Ed. 893, that the act gave to a party to a suit in the circuit court, where the question of the jurisdiction of the court over the parties or subject-matter was raised and put in issue upon the record at the proper time and in the proper way, the right to a review by the supreme court, after final judgment or decree against him, of the decision upon that question only, or by the circuit court of appeals on the whole case. Maynard v. Hecht, 151 U. S. 324, 14 Sup. Ct. 353, 38 L. Ed. 179. And in Carey v. Railway Co., 150 U. S. 170, 14 Sup. Ct. 63, 37 L. Ed. 1041, it was ruled that, in order to hold an appeal maintainable under the second of the above-named classes, the construction or application of the constitution of the United States must be involved as controlling, although on appeal or error all other questions would be open to determination if the inquiry were not rendered unnecessary by the ruling on that arising under the constitution. Horner v. U. S., 143 U. S. 570, 12 Sup. Ct. 522, 36 L. Ed. 266. In U. S. v. Jahn. 155 U. S. 109, 15 Sup. Ct. 39, 39 L. Ed. 87, the supreme court decided that if the question of jurisdiction is in issue, and the jurisdiction sustained, and judgment or decree on the merits is rendered in favor of the plaintiff, then the defendant can elect either to have the question certified, and come direct to the supreme court, or to carry the whole case to the circuit court of appeals, where the question of jurisdiction can be certified by that court."

In the case of Railroad Co. v. Meyers, 10 C. C. A. 485, 62 Fed. 367, the circuit court of appeals for the Seventh circuit (Jenkins, Circuit Judge, delivering the opinion) said:

"The statute organizing this court (26 Stat. 826, c. 517 [U. S. Comp. St. 1901, p. 547]) provides for appeals or writs of error to the supreme court from the circuit court in any case in which the jurisdiction of the court is in issue, and that in such case the question of jurisdiction shall alone be certified to the supreme court from the court below. The circuit courts of appeals have appellate jurisdiction to review the final decisions of the lower courts in all cases other than those authorized to be removed into the supreme court. In McLish v. Roff, 141 U. S. 661-668, 12 Sup. Ct. 118, 35 L. Ed. 893, the supreme court construe this provision of the statute, and assert that the defeated party 'must elect whether he will take a writ of error, or appeal to the supreme court on the question of jurisdiction alone,

or to the circuit court of appeals upon the whole case. If the latter, then the circuit court of appeals may, if it deem proper, certify the question of jurisdiction to this court.' Notwithstanding our recent ruling in Manufacturing Co. v. Barber, 9 C. C. A. 79, 60 Fed. 465, that when the sole question presented by the record goes to the jurisdiction of the court below we are without authority to determine the question, we do not doubt, in view of the recent decision of the supreme court in Maynard v. Hecht, 151 U. S. 324, 14 Sup. Ct. 353, 38 L. Ed. 179, that when, as in this case, other questions are involved, we are authorized to determine that question as well as the others. In the case referred to, the court said: 'The act did not contemplate several appeals in the same suit at the same time, but gave to a party in the suit in the circuit court, where the question of the jurisdiction of the court over the parties or subject-matter was raised and put in issue upon the record at the proper time and in the proper way, the right to a review by this court, after final judgment or decree against him, of the decision upon that question only, or by the circuit courts of appeals on the whole case.' And even were this otherwise, we cannot doubt that we may consider the question of jurisdiction, so far as necessary to satisfy ourselves whether, in the exercise of the discretion lodged with us, the question of jurisdiction involved is sufficiently grave to warrant its submission to the supreme court upon proper certificate, as required by the ruling in Maynard v. Hecht, supra."

The contention of the defendant in error, so far as this question is concerned, is also clearly demonstrated to be without merit by the following cases decided by the supreme court of the United States: Carter v. Roberts, 177 U. S. 496, 20 Sup. Ct. 713, 44 L. Ed. 861; Railroad Co. v. Thiebald, 177 U. S. 615, 20 Sup. Ct. 822, 44 L. Ed. 911; American Sugar Refining Co. v. City of New Orleans, 181 U. S. 277, 21 Sup. Ct. 646, 45 L. Ed. 859.

We do not find it necessary to consider the questions raised by the four instructions given at the request of the plaintiff below relating to the statute of limitations, because of the conclusion we reach concerning the first instruction given, which reads as follows:

"The court instructs the jury that the plaintiff contends for one location of the Nicholas 500,000-acre survey, and the defendants contend for another location thereof, but the first and second corners, known as the 'Muzzle corner' and the 'four white oaks corner,' represented upon the trial map by the letters A and P, respectively, are common to both locations, and therefore said two corners and the line A–P are to be considered and treated as established and undisputed; and there being no evidence, other than the plat and certificate of survey, introduced by any party, tending to show either the present or former situation or the actual existence of the trees called for at the southwest corner or northeast corner of said survey, and the evidence introduced on the part of both plaintiff and defendants, tending to show that James Taylor, the assistant county surveyor of Wythe county, who originally laid off the said tract, and returned the plat and certificate of survey thereof, did not actually survey and run out upon the ground any of the other lines of said survey than the line A–P, either as lines thereof, or of the Nicholas 480,000-acre tract, with which it calls to run, and there being no evidence introduced by any party tending to show an actual running and survey of any of such other lines, and all the evidence upon that point, on the part of both plaintiff and defendants, tending to show that in mentioning certain creeks, rivers, and other natural objects as upon the lines of said survey, which in fact do not exist, or are not found upon the ground according to the courses and distances of the said lines as given in said survey, the said Taylor called for such objects through ignorance or mistake as to the existence or the true location of such objects relatively to each other, and to the lines, corners, and other parts of said survey, such natural objects ought to yield to the said courses and distances in determining what land is embraced within said survey, and must be regarded as false and mistaken description, and said survey must be located by fol-

lowing the courses and distances given in the survey from the said second corner, represented on the trial map by the point P, with such variation of the fifth line as is necessary to close at the northwest corner of the said 480,000-acre survey, ascertained by running the eighth call of that survey its full course and distance from the point A to the point M on the trial map, bounding said grant by the letters A, P, H, I, J, M, A."

The action of the court below in giving this instruction will be, on the hearing of this writ of error, governed by the same principles that apply to cases where a verdict was directed by the court. The idea entertained by the court below, evidently, was that the only conclusion which could be properly reached from the evidence offered to the jury concerning the location of the land mentioned in the declaration was in favor of the contention of the plaintiff below. In this light we will therefore consider the questions raised by the plaintiffs in error, and relied upon by their counsel in their arguments submitted to this court. The giving of this instruction to the jury necessitated the rejection of the large number of instructions offered by the defendants below relating to the location of the land in controversy, as the one given is the antithesis of those rejected.

Where a verdict is directed in favor of either party, the only question respecting the judge's charge that it is necessary for an appellate court to consider is whether or not such direction, in the light of the pleadings and of all the evidence, was right. Reaching the conclusion we do,—that the court below erred in giving said instruction, —it follows that it will not be necessary to consider the instructions that were refused, nor to pass upon other questions raised by exceptions to the court's charge.

The plaintiffs in error insist that in giving such instruction the court below invaded the province of the jury. The defendant in error contends that it is the duty of the jury to find the facts only when there is a dispute concerning them, and where there is evidence sufficient to warrant their submission for the jury's finding, but that when the controlling facts are undisputed there is nothing left but to apply the law, which should be done by the direction of the court. A careful study of all the testimony, and its proper application to the questions involved, impels us to the conclusion that the defendant in error is mistaken in claiming that the controlling facts in the case, as they were presented to the jury in the court below, are undisputed. We think that, if the jury had been permitted to find from the evidence before them the propositions of fact stated in the instruction, they would have been warranted in reaching a conclusion, from the evidence tending to prove that result, other than that stated in the instruction, and that, had they so found, it would not have been proper for the court to have disturbed such finding. If the jury had been permitted to consider the case, and had found the facts to be as contended for by the plaintiff below, in which contention the trial judge evidently concurred, then most undoubtedly the verdict should have been as it was returned; but if there was evidence tending to prove the claim of the defendants, contradictory to and inconsistent with that offered by the plaintiff, from which the jury would have been authorized to find in favor of the defendants, then a direction by the court in favor of either party would have been improper, and should be reversed on writ of error.

It is quite clear that the effect of this instruction was to withdraw from the consideration of the jury much important and pertinent testimony relating to the location of the boundary lines of the plaintiff's grant, and that it therefore is in conflict with that rule of law applicable to all land controversies,—that, while boundary is a question of law, the location of boundary lines is a matter of fact, to be found by the jury from all the evidence before them. An inspection of the record in this case convinces this court that the evidence before the jury was of that character that reasonable men might honestly have differed in the conclusion reached by them on the facts submitted for their consideration; and, such being the case, it follows that this is peculiarly a controversy the determination of which should have been left to the jury, and not have been reached by the direction of the court. The true rule is that, whether the facts are disputed or undisputed, if different minds can draw different conclusions from them, the case should properly be left to the jury.

From the evidence it may be conceded that the court was justified in telling the jury, in substance, that the beginning corner of the grant was at the point designated on the map as A, but it is not at all clear either that the "four white oaks corner," represented on the map by P, or that the line A-P, is "established and undisputed," as the jury were advised by the court they were. Those were matters of fact concerning which there was a controversy, the solution of which it would have been better to have submitted to the finding of the jury. While the witness Harman speaks of seeing three white oaks on the northwest side of Knox creek, near the mouth of a small branch, there is no testimony that any person ever saw the four white oaks called for in the grant, nor were either of the three spoken of by Harman ever blocked or identified as a corner of the Morris grant; and, in addition, Sells, the court's surveyor, testifies that the distance called for in the grant would have taken the corner to a point seven miles further from A than the point P is. The jury might have been warranted, after fully considering all the evidence, in finding the line A-P to be a line of the grant, and the point P to be a corner thereof; but it does not follow from that that the court was justified in telling the jury that the line and the corner were "established and undisputed."

Again, we are constrained to say that the court below should not have told the jury that the plat and the certificate of survey were the only evidence before them tending to show "either the present or former situation or the actual existence of the trees called for on the southwest corner or northeast corner of said survey." At the southwest corner the call is for "three poplars and a sugar tree by a small branch of Knox creek," and at the northeast corner the call is for "three sugar trees and a buckeye by a small branch of" the Guyandotte river. The contention of the plaintiffs in error is that the grant, as well as the plat and survey, tended to prove the existence and the location of the trees called for at said two corners, and that, while the court's instruction virtually admitted that the plat and the survey tended to prove such existence, nevertheless the jury were directed by the court to find to the contrary, so far as the contention of the said plaintiffs in error was concerned. The surveyors, who were

examined as experts, testified that the fact that the surveyor in the original survey called for certain timber at the end of a line would indicate that he was at that point wherever the timber might be located; and they also testified that the fact that the surveyor called for "three sugar trees, twenty poles below the mouth of Gilbert creek, in a bottom," would indicate that the surveyor was also at that point which is ZZ on the map. The court had permitted these surveyors, after their careful examination of the original surveyor's work,—as to the manner and method of his surveying,—to give their testimony as experts; and we are impressed with the idea that such testimony was proper, and of real value, as tending to establish the lines and corners of the survey as they had been originally located. Mr. Sells, one of the surveyors, states:

"He [meaning Taylor, the original surveyor] would mark the corner. take the supposed course to the next line, and arrive at the next corner." "Mr. Taylor's way of locating a survey was leaving the corner he had located and marked, and making his way by the most convenient route to the next corner he had marked."

Mr. Reynolds, another surveyor, testifies that he thinks Taylor located the corner called for on a branch of Knox creek (this is the point Q2); and he also states:

"He [Taylor] marked the corner on some branch of Knox creek, head of the branch, and then marked the mouth of Gilbert's creek in the vicinity of ZZ."

We therefore think it is quite apparent that the court was mistaken when he said that there was no evidence other than the plat and certificate of survey tending to show the existence of the trees called for at the corners before mentioned; and we are also of the opinion that the jury should have been permitted to take into consideration all the testimony relating to said corners, as well as to the other corners and lines of the grant, for it was for them to say, in the light of all of the evidence, whether any of the trees or other objects called for had been located, and whether any of them were corners of said grant.

The court, in another portion of said instruction, tells the jury that:

"In mentioning certain creeks, rivers, and other natural objects, as upon the lines of said survey, which in fact do not exist, or are not found upon the ground, according to the courses and distances of said lines as given in said survey, that said Taylor called for such objects through ignorance or mistake as to the existence or the true location of such objects, relatively to each other, and to the lines, corners, and other parts of said survey."

We find from the record that there was testimony before the jury tending to prove that nearly all of the creeks, rivers, and other natural objects called for upon the lines of said survey, and mentioned in the grant under which the defendant in error claims, were actually found upon the ground as called for in the survey; and especially is this true concerning the line from Q2 to ZZ, running from a branch of Knox creek to the mouth of Gilbert creek. The testimony relating to this line certainly tends to prove the existence of Knox creek; the existence of Sandy river; the existence of the mouth of Turkey creek; the existence of the Northwest Forks of Turkey creek; the existence of the dividing ridge between Sandy and the Guyandotte rivers; the existence of a creek called "Gilbert Creek," and that such

creek empties into the Guyandotte river; the existence of bottom land on the Guyandotte river below the mouth of Gilbert creek; the existence at one time of three marked sugar trees about 20 poles below the mouth of Gilbert creek. The testimony of the three surveyors, Sells, Mathews, and Reynolds, tended to prove that but few of the natural monuments called for along this line were missing, and that Turkey creek emptied into Sandy river at the point where this line is described as crossing that river. Two objects called for on this line, to wit, Buffalo and Pigeon creeks, are not found, though the evidence tends to prove that two streams were crossed at the points indicated, corresponding to the calls for Buffalo and Pigeon creeks. The testimony relating to these natural objects so found, as well as that relating to those not found, should have been considered by the jury, in connection with all the other evidence, for the purpose of enabling them to correctly locate the lines of the grant; and it was error, we think, to advise the jury that said monuments did not exist or were not found as called for, and that therefore they were called for through ignorance or mistake. This part of the instruction is applicable to all the lines of the survey, and tended to mislead the jury; and, besides, it is a mistake to say that "all the evidence upon the point, on the part of both plaintiff and defendants," tended to show that the monuments called for were mentioned through ignorance or by mistake. Some of the testimony was offered for the purpose of proving the contrary, and has that tendency.

With evidence tending to prove the existence of the natural monuments as called for in the grant, the court below, under the impression that such objects had been mentioned by mistake and in ignorance of their true location, and most likely under a misapprehension of the true weight of that part of the testimony, instructed the jury, in substance, to disregard such objects, and to locate the grant by course and distance. The instruction as given by the court below means that, unless the natural objects called for are in accord with course and distance, then such natural objects must be disregarded, and the line located by course and distance. In this the court was in error. It is quite well established, and is now, we think, the universal rule, that a call for a natural object, such as a river, a creek, the mouth of a stream, a hill, a dividing ridge between designated localities, a marked tree, shall control both course and distance. The reason for such a rule is quite apparent. The natural monuments referred to are objects indicating the boundary of the land, are generally easily found, and are, with few exceptions, indestructible. Course and distance are usually descriptive of the designated monuments, depending for their accuracy upon the skill and experience of the surveyor. In Newsom v. Pryor, 7 Wheat. 7, 10, 5 L. Ed. 382, Chief Justice Marshall used this language:

"The most material and most certain calls shall control those which are less material and less certain. A call for a natural object, as a river, a known stream, a spring, or even a marked tree, shall control both course and distance."

In locating the lines of surveys and grants, the following rules, applied in the order named, have generally been observed by our courts

of last resort: First, natural monuments; second, artificial marks; third, adjacent boundaries; fourth, course and distance. Hutch. Land Tit. 530; Dogan v. Seekright, 4 Hen. & M. 125; Doe v. Payne, 11 N. C. 64, 15 Am. Dec. 507; McIver v. Walker, 9 Cranch, 173, 3 L. Ed. 694; Elliott v. Horton, 28 Grat. 766; Trust Co. v. Foster, 78 Va. 413. In Higueras v. U. S., 5 Wall. 827–835, 18 L. Ed. 469, Mr. Justice Clifford said:

"But ordinarily surveys are so loosely made, and so liable to be inaccurate, especially when made in rough or uneven land or forests, that the courses and distances given in the instrument are regarded as more or less uncertain, and always give place, in questions of doubt or discrepancy, to known monuments and boundaries referred to as identifying the land. Such monuments may be either natural or artificial objects, such as rivers, streams, springs, stakes, marked trees, fences, or buildings."

Washb. Real Prop. (2d Ed.) 673; Preston v. Bowmar, 6 Wheat. 582, 5 L. Ed. 336; Marshall v. Currie, 4 Cranch, 176, 2 L. Ed. 585; Purinton v. Sedgley, 4 Me. 286; Howe v. Bass, 2 Mass. 380, 3 Am. Dec. 59; Bosworth v. Sturtevant, 2 Cush. 392; Jackson v. Ives, 9 Cow. 661; Newsom v. Pryor, 7 Wheat. 10, 5 L. Ed. 382; Ricks v. Johnson, 5 N. H. 542.

The defendant in error claims that the facts as disclosed by the testimony make this case an exception to the general rule that monuments shall prevail over course and distance, and the insistence is that the surrounding and connecting circumstances relating to the survey and the intention of the parties render it apparent that the courses and distances called for are more reliable and certain guides to the true location of the grant than are the natural objects mentioned in it. We do not think so. We do not find anything in the description of the land which shows that the courses and distances are right in themselves. On the contrary, all of the surveyors who testified advise us that they are not correct. Nor do we find that the evidence conclusively shows that the original surveyor was mistaken as to the location of the monuments called for, or ignorant of the geography of the territory in which he was surveying. He seems to have located his natural monuments as correctly as was customary in the day in which he lived, and the researches made by his successors of the present day rather tend to demonstrate that he was not deficient in geographical information. He seems to have made a mistake in his mathematics, and to have run the boundary lines of his survey so as not to have included the area intended; but that is immaterial, if it is made to appear that the natural objects called for were really in existence at the time of the survey, that their location was known to the surveyor, or that he was at them during the time of the survey, and marked them or called for them as lines or corners thereof. It should in this particular be remembered that quantity is the least reliable, and the last to be resorted to of all the descriptive portions of a deed or grant. It is only in cases where there is a lack of description, because of the want of course and distance, or where monuments are not called for or are not found, that quantity becomes essential in determining the identity of the premises in controversy. A statement in a grant of the quantity of land supposed to be in-

cluded in the boundaries thereof, inserted by way of description, must yield to the description by metes and bounds, rivers, mountains, and other monuments.

The cases cited by counsel for defendant in error, showing that the general rule to which we have referred—that course and distance must yield to natural objects called for—is not inflexible, are not, in our judgment, applicable to the facts of the case we are now disposing of; and therefore it will not be profitable to discuss them, or to consider them further than we have in effect done by determining the questions of law involved in the court's instruction before referred to.

The case must go back to the court below for a new trial. Other questions raised by the assignments of error it will not be necessary for us to refer to, as we have found error in the court's charge directing a verdict, because of which the judgment rendered in the court below must be reversed.

Let the judgment complained of be reversed, and let the verdict returned be set aside, in order that a new trial may be had on the issue joined. Reversed.