WEST VIRGINIA PULP & PAPER COMPANY *v.* J. NATWICK & COMPANY *et al.*

(No. 9216)

Submitted September 23, 1941. Decided December 9, 1941.

754

E. A. Bowers, Henry Higginbotham and G. W. Mc-
Cauley, for plaintiffs in error.

B. M. Hoover and E. L. Maxwell, for defendant in error.

RILEY, JUDGE:

In this action of ejectment the defendants, J. Natwick
& Company, a corporation, and others prosecute error to
a judgment of the Circuit Court of Randolph County,
overruling their demurrer to the evidence, interposed
after the introduction of all the evidence, and entering
judgment on a conditional verdict for the plaintiff, West
Virginia Pulp & Paper Company, a corporation.

Guiding the appraisement of this case are several well-
established principles of law, applicable to every eject-
ment case in which the defendant demurs to the evidence.
Upon such demurrer all reasonable inferences from all
the evidence introduced at the trial should be consid-
ered by the court in favor of the demurree, but, if de-
murrant's evidence on a decisive point conflicts with that
of demurree and plainly and decidedly predominates in
demurrant's favor, the demurrer should be sustained and
judgment rendered thereon for demurrant. *Conner* v.
*Jarrett,* 120 W. Va. 633, pt. 3, Syl., 200 S. E. 39; *Bluefield
Milling Co.* v. *Western Union Tel. Co.,* 104 W. Va. 150, 139
S. E. 638, 55 A. L. R. 636; *Miller* v. *Johnson,* 79 W. Va. 198,
90 S. E. 677; *Barrett* v. *Raleigh Coal & Coke Co..,* 55 W. Va.
395, 47 S. E. 154; *Bowman* v. *Dewing & Sons,* 50 W. Va.
445, 40 S. E. 576; *Mapel* v. *John,* 42 W. Va. 30, 24 S. E. 608,
32 L. R. A. 800, 57 Am. St. Rep. 839. Notwithstanding a de-
murrer to the evidence, the burden of proving title and
locating land in an ejectment case rests on the plaintiff.
*Conner* v. *Jarrett, supra,* 640; *Rock House Fork Land Co.*
v. *Gray,* 73 W. Va. 503, 80 S. E. 821; *Bowman* v. *Dewing &
Sons, supra.* In sustaining this burden of proof, a plain-
tiff in ejectment who relies upon title and not adverse
possession must recover on the strength of his own title
and not upon the weakness of that of defendant. *Conner*

v. *Jarrett,* supra; *Wm. James Sons Co.* v. *Hutchinson,* 73 W. Va. 488, 80 S. E. 768; *Taylor* v. *Russell,* 65 W. Va. 632, 64 S. E. 923; *Wade* v. *McDougle,* 59 W. Va. 113, 52 S. E. 1026.

Plaintiff claims that its title to the property involved originated under a grant dated February 22, 1799, from the Commonwealth of Virginia to Bowler Cocke of two thousand acres of land, surveyed for Simon Nathan, December 10, 1787, and referred to in later conveyances as Lot No. 12; that this tract, together with other tracts in the Nathan survey, having been returned delinquent for taxes in the name of Cocke, was conveyed to Richard W. Barton by John W. Crawford, Clerk of the County Court of Randolph County, under a tax deed dated April 30, 1853; that the Crawford deed recites that the lands had been sold for taxes, delinquent in the name of Bowler Cocke, for the years 1832 to 1839, inclusive, and purchased in October, 1840, by the Sheriff in behalf of the Commonwealth for the amount of taxes and damages due on each tract; that on October 27, 1845, said lands were again offered for sale and purchased for the commonwealth; that Richard W. Barton by his last will and testament, dated January 14, 1860, devised the land to his executors with power to sell; that after transition through a chancery suit in Randolph County, entitled "Geo. McIntosh v. R. W. Barton's Administrator" (the record of which was omitted from the instant record by stipulation of counsel), and the death intestate of Caroline M. Barton, Richard W. Barton's wife, the title became vested in Joseph M. Barton and others, and thereafter devolved upon A. H. Winchester by two deeds, one dated December 12, 1885, from Joseph M. Barton and others, and the other dated December 13, 1886, from Claude Goff, Special Commissioner.

Plaintiff also introduced, as a part of its chain of title, a deed from George McIntosh to Richard W. Barton, dated April 5, 1855, purporting to convey five tracts of two thousand acres each of the Nathan survey, including Lot No. 12. This deed referred to a deed from William Loyall to said McIntosh, recorded in Randolph County in "Book '9,' Page 443." The Loyall deed, dated June 13, 1826, pur-

ports to convey five tracts of two thousand acres each granted to "Bowler Cocke," but does not give any lot numbers, though it gives four lines and corners similar to the calls given in the original grant from the Commonwealth of Virginia to Cocke, dated February 22, 1799. The record here, however, does not show any conveyance of Lot No. 12 from Cocke, but the Loyall deed recites that Cocke conveyed "said several tracts" on June 30, 1799, to John Bell; that John Bell, by deed dated October 31, 1803, conveyed said tracts to William Davis; that Davis "transmitted by devise or descent" said tracts to his daughter, Ann Whittle; that she and her husband conveyed them to the United States of America; and that the Loyall deed was made pursuant to a decree of the United States Circuit Court.

Defendants say that between the last purchase by the Commonwealth for taxes (1840) and the Crawford tax deed (1853), the Commonwealth issued its patent in the year 1847 to William Logan for a one thousand-acre tract, covering a part of the original Nathan survey, and including a 315-acre tract under which they derived their title, and that because the Logan grant, under which they claim, antedated the Crawford deed to Barton, under which plaintiff claims, the latter to prevail must trace its title to the Commonwealth. It is strenuously contended that plaintiff has failed to do so, whether it seeks to prevail under the line of title which leads through the Crawford tax deed or under that which leads through the Loyall deed. This position is not without merit, for the reason that the line of title through Loyall, so far as the record title is concerned, does not reach back to the original grantee, Cocke, and that if reliance is had upon the chain of title running through the Crawford deed to Richard W. Barton, the Logan grant came from the Commonwealth of Virginia by grant which antedates the deed from the Commonwealth to Barton. In an action of ejectment where the plaintiff relies upon paper title, he must either connect title to a senior grant from a common source or by an unbroken chain of title to the Commonwealth or the State. *Furbee* v. *Underwood,* pt. 1, Syl., 107 W. Va. 85,

147 S. E. 472; *Winding Gulf Collieries Co. v. Campbell,* 72 W. Va. 449, 78 S. E. 384. See generally, note to *Jennings* v. *Marston,* 121 Va. 79, 92 S. E. 821, 7 A. L. R. 855, 860-889, inclusive.

However, the solution to this problem lies in the fact, as we shall discuss later, that this is a case of adjoiner and not interlock, and the plaintiff, under the Barton deed, notoriously, continuously, adversely, and exclusively, for the period of the statute of limitations for land, has held the land embraced in that deed. Not only did it enter into actual possession of the land, but in addition it erected buildings, operated a coal mine and maintained a boarding house used by its employees. This occupancy was of such a substantial nature that it constitutes the kind of possession we think may be relied upon under a claim of adverse possession. True, plaintiff did not actually occupy the land in controversy, nor did the defendants.

In this State, it is well settled that "color of title, for the purpose of adverse possession under the statute of limitations as to land, is that which has the semblance or appearance of title, legal or equitable, but which is in fact no title. Any written instrument, however defective or imperfect, no matter from what cause invalid, purporting to pass or convey title to land, which defines the extent of the claim under it, is color of title." *Swann* v. *Thayer,* pt. 1, Syl., 36 W. Va. 46, 14 S. E. 423. The principal purpose of color of title, this Court has held in cases too numerous to be conveniently mentioned, is not to show an actual grant of the land or any interest therein, but to designate the boundary of plaintiff's claim. *Goad* v. *Walker,* 73 W. Va. 431, 80 S. E. 873; *McQueen* v. *Ahbe,* 99 W. Va. 650, 130 S. E. 261. It follows that if plaintiff here succeeds in locating the adjoining lines on the ground, it will be entitled to prevail notwithstanding its title to a common source or the Commonwealth or the State may not have been traced. *Riffle* v. *Skinner,* 67 W. Va. 75, 67 S. E. 1075; *Wiley* v. *Hatcher,* 70 W. Va. 92, 73 S. E. 245.

Defendants claim under a record title through the William Logan grant to the aforementioned 315-acre tract, which is referred to throughout the record by the names of various owners in line of title, i. e., as the A. C. Logan,

the Snyder or the Wilson tract of land. Although enclosed by more than three lines this tract is substantially triangular in shape, its southeastern boundary forming its base. This 315-acre tract was carved out of the tract embraced in the William Logan grant, under a survey made for A. C. Logan, one of defendants' predecessors in title. The call in the William Logan grant, which provoked this litigation, runs from a point described as "2 beeches and a number of pointers between 2 small drains. Thence S. 50° E. 100 poles to a Thorn and yew and beech pointers on the top of said [Cheat] mountain." Plaintiff contends the line should be run a distance of 102.72 poles to a large spruce marked as a corner, and defendants assert it should be run for an additional distance of 114.56 poles where the projected line crosses the crest of Cheat Mountain.

In the Barton deed these calls appear: "S. 47 W. 206 ps. to two beeches with pointers, a corner of a survey of 315 acres made for A. C. Logan, (now owned by Harmon Snyder), thence with said survey S. 49 E. 100 ps. to a yew pine and pointers, where a thorn is called for in said survey, thence S. 61, W. 260 ps. to a large sugar beech and yew pine on top of Cheat Mountain on a line of No. 12 of said Barton Land," and running in reverse the deed contains the call: "Thence N. 64½ W. 260 ps. to point on the top of Cheat Mountain on a line of a survey of 315 acres made for A. C. Logan and now owned by Harmon Snyder." This last-mentioned point evidently is the same reached in the last of the three above-mentioned calls. Thus it can be seen that defendants' land at the point in controversy adjoins plaintiff's land. This is necessarily so because plaintiff has declared upon a single tract of land, and defendants have disclaimed two parts thereof in a disclaimer, which makes plaintiff's land adjoin defendants!

This case, therefore, necessarily presents one of adjoiner and not interlock. A call of a deed to the line of adjoiner in no case can make an interlock between the land conveyed thereby and the land of the adjoiner (*Cummings* v. *Hamrick,* 74 W. Va. 406, 82 S. E. 44); and

a dispute between conflicting claims as to true lines and corners does not of itself constitute an interlock. *Robinson* v. *Sheets,* 63 W. Va. 394, 61 S. E. 347; *Oney* v. *Clendenin,* 28 W. Va. 34, *Storrs* v. *Feick,* 24 W. Va. 606, 613.

Because the case is one of adjoiner and the defendants' source of title is senior to the grant under which plaintiff claims title, it is necessary for plaintiff, in order to prevail, to establish the lines of the Snyder tract, which adjoin its lines at the points in controversy. *Miller* v. *Holt,* 47 W. Va. 7, pts. 1 and 3, Syl., 34 S. E. 956; *Yonker* v. *Grimm,* 101 W. Va. 711, 133 S. E. 695. This case, therefore, is one in which plaintiff has the burden not only of proving title upon its own strength but also by establishing defendants' adjoining lines.

The Logan grant (1847) is based on a survey made the preceding year, two reports of which were recorded on February 4, 1846. The first report appearing in the record bears the notation: "This Plott was rong." A comparison of the calls of these reports of survey, as defendants' petition for the writ of error and the record disclose, shows that in each report one call is missing: in the first, the call "S 59 W 268 poles to yew and beech," and, in the second, the call "N 70 W 231 ps. to a beech & sugar and six beech pointers on the top of a ridge & on a line of Adam Sees 750 acre survey." The grant, which contains eighteen calls, one more than either of the recorded reports of survey, includes both of the omitted calls. In this grant we find two other calls, which it is necessary to mention at this time, namely, "S. 60° E. 72 poles to 2 beeches and a number of pointers between 2 small drains [this point is an agreed corner designated as "A" in the reports and on the plats of the official surveyor appointed by the trial court] Thence S. 50° E. 100 poles to a Thorn and yew and beech pointers on the top of said mountain." The first monument mentioned in the foregoing quotation is the same point as "the two beeches with pointers," the corner called for in the Barton deed by the line "S. 47 W. 206 ps. to two beeches with pointers, a corner of a survey of 315 acres made for A. C. Logan"; and the call in the Logan grant "S. 50° E. 100 poles to a Thorn and yew and beech pointers

on the top of said mountain" is the same as the call in the Barton deed: "S. 49 E. 100 ps. to a yew pine and pointers, where a thorn is called for in said survey."

Under the orders of the trial court Owen Crickard, the county surveyor of Randolph County, made two surveys, one in April, 1938, and the other about a year later. He located certain points, surveyed certain lines, and protracted certain other lines which he thought advisable or as he was directed by the litigants. In the consideration of the surveyor's report, we take notice from the evidence that in the older surveys in Randolph County the word "yew" was used for "spruce," though technically the words, as disclosed by modern dictionaries, designate different kinds of trees.

From point "A," at plaintiff's direction, Crickard ran the course and distance in the Barton deed, with a three-degree variation, S. 46° E. with a yellow painted line. At a point 72.16 poles from the origin of this line he noted a spruce, marked for a center line with two hacks on each side, standing .24 poles to the left of the line. At plaintiff's request, he blocked this tree and counted ninety-three annulations. He then continued the line for a distance of 102.72 poles from the beginning to a point .96 poles to the left of a large spruce, marked as a corner, with markings showing a line entering from the direction of the last-mentioned course and another leaving in the direction of the next line in the Barton deed. Upon having been blocked, this tree also disclosed ninety-three annulations. About eight feet to the northwest of the spruce the surveyor noted a beech snag. The corrected bearing and distance required to run from point "A" to the spruce and beech, a point designated in the report and on the plats as point "B," is S. 45° 30' E. 102.72 poles. From point "B," at plaintiff's direction, the surveyor ran a line S. 64° W., a variation of three degrees from the course in the Barton deed. At 136 poles, he blocked a fallen spruce 2.28 poles to the left of the line; at 140 poles another spruce, standing approximately 2 poles to the left of the line; and at 155.12 poles a third spruce standing 2.88 poles to the left of the line. Each had eighty-four

annulations. At 263.68 poles he came to a large sugar tree, stones painted yellow and red, with cherry and three beech pointers on the ridge of Cheat Mountain, which he designated in his report and on the plats by the letter "C."

At defendants' direction the surveyor extended the line "A" to "B" an additional distance of 114.56 poles to a point on the top of Cheat Mountain 467.11 feet higher than "B" which he designated on the plat by the figure "7," where he found no markings of any kind. Because the top of the mountain was substantially level for a considerable distance near the top where the line "A" to "B" extended crosses the crest, he had to take twelve levels to locate point "7." From point "7," at defendants' request, following the same bearing as that of "B" to "C," namely, S. 64° W., he ran to point "9" a distance of 331.16 poles.

The discussion so far brings us to the exact factual question in controversy. Plaintiff contends the line "A" to "B" on the official plats should stop at the marked corner spruce, and that defendants' southeasterly line, which adjoins plaintiff's land, runs from "B" to "C"; but defendants say that the spruce marked as a corner at "B" should be disregarded and the line "A" to "B" extended to the point "7," and that, therefore, defendants' southeasterly line begins at "7" and runs S. 64° W. 331.16 poles to the point designated on the plat as "9."

The official surveyor, at defendants' direction, began at point "A" on the official plats and running from the calls of the A. C. Logan deed, reversed, with a four-degree variation, i. e., N. 56° W. 73.84 poles reached a point .72 poles left of a large maple, bearing three hacks. He then assumed the maple to be the one called for in the deed and corrected the bearing to N. 55° 30′ W. to reach that point, which he designated on the map as "1," an agreed point. Then he continued with the next call of the Logan deed reversed with four-degree variation N. 66° W. At 139.92 poles he passed four feet to the left of a large hemlock marked for a center line, and at 172 poles set a stake, the original beeches called for as the beginning corner in the A. C. Logan deed not being found. He then designated

this point by the figure "2." This line, reversed, in the William Logan grant reads: "Beginning at 3 beeches corner to land of Washington G. Ward at the upper end of the Rich knobb & with his line S. 70° E. 172 poles to a birch, yew and maple corner to Ward." Point "2," as shown on the plat, also an agreed point, is the beginning point of A. C. Logan 315-acre tract as the surveyor located it on the ground.

Using the lines "2" to "1," "1" to "A," "A" to "B," and "B" to "C," as designated on the plats, Crickard protracted the other lines in the William Logan grant and the A. C. Logan deed, platted the same and obtained a substantial closing of both. He then assumed that the S. 45° 30′ E. line, "A" to "B," should extend through "B" 114.56 additional poles to point "7," and that the lines "7" to "9" and "9" to "10," surveyed at defendants' request, were correct; and, at plaintiff's request, supplied the unsurveyed lines by protraction from the Logan grant. Official plat No. 2 shows he reached a point designated "41" thereon, which should have been the closing point. This point, on the basis of the scale designated on the plat of eighty poles to an inch, is about 100 poles or 1650 feet from the beginning point "2" as designated on said plat.

On the basis of plaintiff's theory, the Snyder tract, as Crickard calculated it, has an acreage of 315.4 acres. Under defendants' theory that the southeasterly boundary of the Snyder tract begins at point "7" and proceeds S. 64° W. 331.16 poles to the point "9" designated on the map; thence to point "10"; thence to point "11"; and prolonging the westerly boundary line of said tract from points "11" to "4" on the plat, as suggested by defendants, the tract would have an additional acreage of 212.52 acres, or a total of approximately 527.92 acres.

In order to effect a closing of the 315-acre tract, as suggested by defendants, it became necessary for the surveyor to run the line "7" to "9," as shown on the plat, to a distance 331.16 poles, 67.48 poles longer than the line "B" to "C," and 63.16 poles longer than the call in the Logan grant; and he was required to prolong the westerly

line of the 315-acre tract from 340 poles, the distance in the A. C. Logan deed, to slightly more than 440 poles.

Thus, if defendants' theory is correct, it is necessary, to effect a closing of the plat, that three lines of the Snyder tract be greatly extended; that its acreage be almost doubled; and that the large corner spruce with its ninety-three annulations, indicating markings made about the year of the Logan survey, would have to be disregarded as a corner monument; and that if only line "A" to "B" is extended to "7," the William Logan tract of one thousand acres, as we have suggested, will fail to close by one hundred poles.

But defendants' counsel say that the top of Cheat Mountain at "7" on the plat is a natural monument which should control over courses, distances and quantity of the land. They rely upon the general rule that monuments, natural and artificial, prevail over courses and distances, or mistaken descriptions in surveys or conveyances; that, after calls for monuments, courses and distances are the most certain items of description, and that quantity is not generally important. Hutchinson's Land Titles in Virginia and West Virginia, Sections 528, 529, 530, 531, 532, 536, 541. For a general statement of the rule, as established in this jurisdiction see pt. 1, Syl., *Matheny* v. *Allen*, 63 W. Va. 443, 60 S. E. 407, 129 Am. St. Rep. 984. How then can the call in the Logan grant, "Thence S. 50° E. 100 poles to a Thorn and yew and beech pointers on the top of said mountain" be explained?

Counsel for plaintiff say that the first Logan survey was wrong, not only because it contains the notation, "This Plott was rong," but because it left out the course and distance "S 59 W 268 poles," as well as one monument or corner; that the surveyor, in the second report, in attempting to correct his first error, omitted the next succeeding course and distance, and transposed the monuments immediately preceding and following the course and distance "S 59 W 268 poles"; and that this error of transposition was carried into the report of survey upon which the William Logan grant was later based. In other words, it is counsel's contention that the monument

"to a thorn and yew and beech pointers on the top.of said mountain" was moved ahead of the course "thence S 59 W" and the monument "to yew and beech" to a position immediately following, whereas the latter should have been inserted before the said course and distance, thus making the preceding call read, "thence S. 50° E. 100 poles to a yew and beech." Thus, as we understand the contention, the two calls (beginning at point "A" on the plats of the official surveyor) should read: "thence S. 50° E. 100 poles to a yew and beech; thence S. 59° W. 268 poles to a thorn, yew and beech pointers on the top of said mountain." This position is entirely plausible, but not of itself decisive of this case.

The record contains much evidence bearing on the question of the location of the thorn on the top of Cheat Mountain mentioned in the call "S. 50° E. 100 poles to a Thorn and yew and beech pointers on the top of said mountain." Plaintiff says it was anciently located on a low level place on the top of the mountain at point "C," and defendants say that, though the official surveyor found no marked trees at point "7," it was at that point in years gone by. Notwithstanding that, when the official surveys were made, there was no corner thorn at either of the two contested points, the evidence bearing on its former location is admissible. The location of a lost ancient land monument in an ejectment case may be proved by reputation. *Faulkner* v. *Thorn,* 120 W. Va. 575, 200 S. E. 581; *Harriman* v. *Brown,* 35 Va. 697, 8 Leigh 697, 707, 8 Am. Jur., Boundaries, Sec. 93.

The 315-acre tract was formerly owned by William H. Wilson and occupied by W. H. Painter, as the former's caretaker and tenant. Both Wilson and Painter are dead. The defendant, G. W. Wilson, the son of William H., testified that the thorn was formerly located at the top of the mountain at point "7" on the official plats. However, Bessie Steele, age forty-three, one of W. H. Painter's daughters, testified that she lived on that part of the Wilson farm adjoining the Snyder tract from the time she was three months until she was thirteen or fourteen years of age; that in 1906 or 1907 her father pointed out to her

a thorn stump near the top of the mountain "on a flat," which he said was the "thorn corner" of the Wilson land, the line between Wilson and "the Spruce People * * * the Pulp & Paper Company, I guess it was." She further testified that on the side of the mountain on which she lived there was a hacking known as the Wilson hacking (sometimes spoken of as the Snyder hacking), and on the other side one known as the Beard hacking, and that in order for one to get from the Wilson hacking to the stump, it was necessary to "get down off the top" of the mountain. H. T. Painter, W. H. Painter's brother, testified that he helped remove cherry timber from the Beard and Snyder tracts; that the latter pointed out to him as a corner between the Beard and Snyder tracts a thorn located in a gap, a "little low place" "along the ridge running from the top of the mountain down to the Beard place"; and that two paths ran by the thorn tree, one leading to Rocky Run and the other down the ridge to the Beard hacking. Mrs. Hobart Steele, age forty-six, another of W. H. Painter's daughters, testified that she lived on the Wilson property from the time she was three until seventeen years of age; that she had been at the thorn corner on a number of occasions prior to 1907, the year the thorn tree had been cut off flush with the ground; that the thorn had three notches on it; that a path connecting the Wilson and Beard hackings led past, and within a few rods, of the thorn; that on returning from hunting cattle on various occasions, when the party, including herself, arrived at the corner and the path which led by the thorn, her father, referring to the Snyder tract, would remark, "Well, we are on our land." This witness also stated that she used the path in going fishing.

The surveyor, Crickard, also testified as to the existence of a path at point "C." B. F. Cromer, age eighty-three, a former employee of plaintiff, who had been caretaker of its property for more than half a century, testified as to the location of a corner thorn at the low place in the mountain at point "C."

The testimony of H. T. Painter, Mrs. Bessie Steele, Mrs. Hobart Steele and Cromer as to the declarations of

William H. Wilson, deceased, and W. H. Painter, deceased, owner and tenant, respectively, of the 315-acre tract and the location of the thorn tree near the paths at point "C" is admissible. In an action in ejectment the declarations of a deceased owner of land are admissible, if they relate to a line or corner of his own land in the ascertainment of which he has an interest. *State* v. *King,* 64 W. Va. 546, pt. 9, syl., 63 S. E. 468, the error dismissed, *King* v. *State of West Virginia et al.,* 216 U. S. 92, 30 S. Ct. 225, 54 L. ed. 396. If in other respects admissible and not made *post litem motam,* the rule applies with equal force to declarations made by a deceased tenant, if paper title in the landlord, as in the instant case, be shown. Pt. 9, Syl., *State* v. *King, supra.*

We think it is important that, notwithstanding defendants' contention that the thorn formerly stood at point "7," no witness testified to the existence of paths at that point, and that the testimony to the effect that the path connecting the Wilson and Beard hackings passed near point "C," is substantially uncontradicted. Thus the record discloses a conflict of evidence bearing on the question whether the corner thorn in the monument in the William Logan grant "a Thorn and yew and beech pointers on the top of said mountain" was located at "C" or "7." If this conflict is to be solved in defendants' favor, the strong and uncontradicted evidence of the old corner spruce tree at point "B," marked as a corner and showing an outgoing course leading in a general direction toward "C," would have to be disregarded, although it is a monument of high dignity.

This case, therefore, should be distinguished from *Conner* v. *Jarrett, supra,* and *Wiley* v. *Hatcher, supra.* Those cases involved definite monuments, in the former a well-defined stream, the Mink Shoal Branch, and in the latter a sharp point of a mountain, well known to the people residing in the vicinity, called for in an ancient deed, "two white oaks on Cooper's Point." The record in the latter case was thoroughly studied and shows that the point was indeed a sharp crag at the top of a mountain, which could and evidently was determined without the

use of a level. The natural monument in the *Conner* case could have been determined simply by the extension of a known line. In the instant case, because Cheat Mountain, where the line "A" to "B" extended reaches the crest at point "7" on the plat, is flat for a considerable distance near the top along the extended line, the surveyor had to take twelve levels in order to ascertain the mountain top at that point. The reason that monuments usually prevail over courses, distances and quantity of land is that the liability of error is ever present in the use of surveying instruments. Here, the surveyor, after ascertaining, with the aid of a level, the top of Cheat Mountain at the point contended for by defendants, found no markings or paths of any kind, whereas point "C" at the large sugar is also on top of the mountain and has been identified by substantial evidence as the place where the corner thorn called for on top of the mountain formerly stood near the path extending between the two hackings.

In the decision of this case, we are not required to and do not abrogate the well-settled rules governing the relative evidentiary value of monuments, courses, distances and quantity of land, which time and again this Court has applied in ejectment cases in ascertaining the location of land. This case is one simply involving the identity of monuments, which has been solved in plaintiff's favor. The beginning point of the Logan survey, the terminus of the call from it, the call of the next line to "A" on the plat, and the line from "A" to the large corner spruce at point "B" hacked so as to indicate a course running in the general direction of the line "B" to "C" have been definitely determined by this record, and the lines and corners are agreed corners except as to point "B." Under the facts disclosed by the record, would the jury have been justified in disregarding the claimed monument at point "7," and establishing the lines from "A" to "B" and "B" to "C," as shown on the official plats? This Court held, in the case of *Palmer* v. *Magers,* 85 W. Va. 415, pt. 9, Syl., 102 S. E. 100: "If one terminus of a disputed boundary line called for in a deed, is clearly fixed and rendered certain by evidence and the other unidentified and

uncertain and a line run from such fixed corner agrees perfectly with the calls of the deed for course and distance, the former governs and controls the location of the other and the distance called for in another line running to it." In *Lewis* v. *Yates,* pt. 2, Syl., 72 W. Va. 841, 79 S. E. 831, this Court held: "One or more monuments of a tract of land having been ascertained, the courses and distances are entitled to controlling effect in the location of others as to the identity of which the evidence is slight, circumstantial and conflicting."

Under the demurrer to the evidence, showing, as it does, the clear identity of the marked corner spruce at "B," the conflict of the evidence as to the former location of the corner thorn at "C" near the paths at a low place on the mountain, with that to the effect that its location was at point "7," and the strong support which plaintiff has in courses, distances, and quantity of the land, we are prompted to hold that defendants have failed to establish the identity of the monument at the terminus "A" to "B" as extended to "7." On the contrary, plaintiff, in our opinion, has sustained the burden of proving and locating defendants' adjoining lines consonant with its theory of the case, and therefore is entitled to prevail.

For these reasons the judgment of the trial court is affirmed.

*Affirmed.*

Fox, Judge, dissenting:

I am unable to concur in the opinion of the majority in this case, on the question of the location of the boundaries of the lands involved herein, and dissent therefrom. The parties will be referred to as they stood in the trial court.

In my opinion the plaintiff has made out a case entitling it to recover in ejectment such land as lay within the boundaries described in its title papers, and other evidence produced. While there may be serious doubt as to whether it has connected its title with the commonwealth, the fact that the boundaries of plaintiff's land are con-

trolled by the lines of the Snyder tract of 315 acres, makes this a case of an adjoiner, and not an interlock; and there being no actual possession within the disputed area by the litigants, or any other person, the showing of possession by the plaintiff, for the statutory period of ten years, under color of title, outside the disputed area, and within the boundaries described in the papers constituting such color of title, created a right of recovery to lands within such boundary, independent of its paper title, but did not extend beyond the lines of the Snyder tract. As I view the case, the boundaries of the Snyder tract must determine this controversy. Judge Riley's able and painstaking discussion of the evidence bearing upon this question relieves me of that task, but I cannot agree with his conclusions. I think the trial court should have sustained defendants' demurrer to the evidence, and rendered judgment in their favor, on the sole ground that the boundaries of plaintiff's land, properly located, did not include the land in controversy.

The rule that "In locating the boundaries of land, courses and distances must yield to the natural and marked monuments called for in the instrument," 2 Va. and West Va. Digest, 294, is so well established in this jurisdiction that, ordinarily, citation of authority in support thereof would seem unnecessary. However, the majority holding calls for a discussion of this question.

"Natural monuments include such natural objects as mountains, streams, rivers, creeks, springs, etc. Artificial objects and monuments consist of marked lines, stakes, roads, fences, buildings, and similar matters marked or placed on the ground by the hand of man." 8 Am. Jur. 747. "Whenever natural monuments or objects which include mountains, rivers, creeks, and rocks, are distinctly called for and satisfactorily proved, they become landmarks to which preference must be given, because the certainty which they afford excludes the probability of mistake. Ordinarily, a preference is given to natural objects over artificial monuments in determining boundaries, but natural objects cannot prevail when they are doubtful, and in that case recourse is had to artificial

marks or monuments or other calls of an inferior degree of accuracy." 8 Am. Jur., 785. "In locating lands the following are some of the rules resorted to, and generally in the order stated: (1) Natural boundaries; (2) artificial marks; (3) adjacent boundaries; (4) courses and distances—course controlling distance, or distance, course, according to circumstances. Neither rule, however, occupies an inflexible position, for when it is plain that there is a mistake, an inferior means of location may control a higher." *Teass* v. *City of St. Albans*, 38 W. Va. 1, 17 S. E. 400, 406, 19 L. R. A. 802; *Dogan* v. *Seekright*, 4 Hen. & M. 125. Supporting a natural monument over an artificial one, the Supreme Court of Appeals of Virginia, in 1854, said: "Artificial monuments are liable to destruction." *French* v. *Bankhead*, 11 Gratt. 136-158. A marked tree is an artificial monument because the hand of man had a part in its making. The tree may decay and fall; many things may obliterate the marks; and therefore, while such a tree, while standing, is a monument of high degree, it still falls short of the dignity of a natural monument such as a mountain, ridge, or stream.

Here we have a dispute as to which of two monuments is to be preferred. One is a tree, not clearly, and divorced from other monuments, called for in any title paper introduced in evidence, but marked as a corner, and the age of the marking corresponding to the date of a patent introduced in identification of the land claimed by the plaintiff; and the other a natural monument, "on top of said (Cheat) Mountain," with an additional call for a thorn not now standing, but claimed to have stood at that point, and later destroyed by act of man. No claim is made that the tree first mentioned is on or near the top of the mountain. The undisputed evidence is that it is located on the side of the mountain, some 1890 feet below the top, surface survey, and 467.11 feet below by perpendicular measurement. Both monuments are reached by running a straight line from an admitted corner of plaintiff's land, one, that standing on the side of the hill is reached by running 102.72 poles from said admitted cor-

ner, and the other, the top of the mountain, by extending said line an additional distance of 114.56 poles.

In my opinion, the line should be run to the top of the mountain, and my views are based on what I conceive to be the uniform and consistent holdings of the courts of last resort in this state and Virginia. In passing, it should be said that, in respect to land law, we not only give proper weight to cases decided prior to separation, but to later cases as well, because to a peculiar degree, the two states have closely tracked with each other in this branch of the law. I shall, therefore, discuss the decisions of the courts of the two states together, for the reason that there is no conflict between them, and rules established prior to separation have been closely followed in both states since that date.

Strangely enough, the rule that courses and distance must yield to monuments was first announced in Virginia in a case where no monuments were called for in the deed. In *Baker* v. *Seekright,* 1 Hen. & M. 177, decided in 1806, it was held: "When a deed mentions the course and distance of a line, without any other description thereof, parol evidence is admissible to prove marked trees, not in the course or termination of that line, to be the true line intended." That case was referred to in *Dogan* v. *Seekright, supra,* wherein it was held: "Natural or reputed boundaries, or lines of marked trees, ought to be established in preference to mere course and distance, or to mistaken descriptions in surveys or conveyances." In *Pasley* v. *English,* 5 Gratt. 141, 142, it was held: "Upon questions of boundary where the particulars of description in the deed are conflicting, it becomes necessary to select those most worthy of confidence; and it is well settled that courses and distances must yield to the natural and marked monuments called for in the instrument." The case then goes on to remark that some cases hold that monuments to control courses and distances must be called for in the conveyance, while others hold that where marks are found on the ground corresponding with the date of the conveyance, they may be considered as marking the true course of the line of the termini thereof.

Then follows this statement: "The Virginia cases seem to have gone still further, and have given much weight to marked lines of such description, found on the ground, though corner trees, not to be found or ascertained by evidence, are called for in the instrument, or though inconsistent with points in a plat referred to, especially of comporting with natural objects mentioned." In *Elliott* v. *Horton,* 28 Gratt, 766, 767, the three cases cited in this paragraph are referred to and approved.

These early Virginia cases are cited to show how, as applied to marked trees and other artificial monuments, course and distance must yield, even to the extent of recognizing monuments not called for in the conveyance; and would seem to add weight to the plaintiff's contention with respect to the spruce and beech at point "B" on the trial map. However, it should be noted here that these trees are in the line which defendants claim and on top of the mountain at point "7" on said map, and if we treat them as line trees only they do not lessen the strength of defendants' claim. Other contentions with respect to these trees will be hereafter considered.

We now come to the vital question, which is, whether or not the line in question must be run to the top of the mountain. That a ridge or mountain is a natural monument is not, as I understand the majority opinion, questioned, and my position is that this being true, such natural monument must prevail over a marked tree. Where repugnancy exists between course or distance and a natural monument, the monument prevails. "Where such repugnancy exists, the general rule is that both course and distance must give way to natural or permanent objects or monuments, and courses must be varied and distances lengthened or shortened so as to conform to the natural or permanent objects or monuments called for by the grant or survey." *Clarkston* v. *Virginia Coal & Iron Co.,* 93 Va. 258, 24 S. E. 937. In that case, the call was "thence South 17° East 200 poles crossing the said creek (Dixon's Branch) at 34 poles, to a stake on top of Looneys Ridge," and then called for running with the ridge. That the line ran to the top of the ridge was not questioned,

and the dispute was as to whether the line from that point should run with the ridge or, following the course of the call, depart therefrom, and it was held that the line must be run with the top of the ridge "or at least the line must be kept with the ridge." See also, *Scott* v. *Jessee*, 143 Va. 150, 129 S. E. 333, which involved a line running along the top of a ridge, and where it was held that the line called for must run with the top of the ridge. In *Fentress* v. *Pocahontas Fowling Club*, 108 Va. 155, 60 S. E. 633, it was held that, "In ascertaining the boundaries of surveys or grants, if natural or permanent objects are called for as a boundary of the land, they control, and courses and distances must yield." In that case, water courses were given as boundaries. *Reusens* v. *Lawson*, 91 Va. 226, 21 S. E. 347, 349, was a case where one of the calls in the surveyor's book was "thence with McLeans line N. 23° E. 1280 poles to McGruder's corner chestnut on top of the mountain," and this was in conflict with the calls of the grant. The Court held that the calls of the grant should prevail, but took occasion to discuss the effect of the call quoted above had it been proper to consider the same and said: "If this additional description in the surveyor's book be treated as a part of the description of the land embraced within the Lee Grant, and there be any conflict between them, which is to control in the location of the land? In running the first line from the beginning the call of the grant is 'N. 23° E. 1280 poles, to a chestnut.' Ought the survey to stop at the end of the 1280 poles, the distance called for, or ought it be run to the McGruder corner on top of the mountain, as called for in the survey on the surveyor's book, without regard to course and distance? The general rule is that course and distance must yield to other calls, especially to natural objects like the top of a mountain or a corner tree. If that be the correct rule for locating the Lee grant, it will be located, not by its own calls, but by the calls of the survey or the surveyor's book, and in so locating the calls and description of the grant may be disregarded, and its location determined by the description in another instrument, which is no part of the grant, and upon which it is

not based. Taking the grant without the surveyor's book, course and distance would govern if no corner tree was found." I think it clear that if the surveyor's book had been allowed to amplify and control the description of the grant the court would have held that the 1280 poles line would have been run to the corner called for on the top of the mountain. The syllabus point covering this question is: "Courses and distances must yield to other calls, especially to natural objects, like the top of a mountain or a corner tree."

The natural monument rule has wide support in the decisions of the Federal courts. In *Newson* v. *Pryor,* 7 Wheat. 7, 10, 5 L. Ed. 382, Chief Justice Marshall said: "The most material and most certain calls shall control those which are less material and less certain. A call for a natural object, as a river, a known stream, a spring, or even a marked tree, shall control both course and distance." It will be noted that a "marked tree" is considered less important than natural monuments. In *Watkins* v. *King,* 118 Fed. 524, the Circuit Court of Appeals, through Judge Goff, a West Virginia lawyer, said: "Under the settled rule that calls in a survey for natural objects must control both course and distance, it is error for a court to charge a jury to ignore such calls, as having been made through ignorance or mistake, and to be governed by courses and distances, because the objects called for are not found on the courses or at the distances called for, where there is evidence tending to show that the objects exist, and to identify them sufficiently to justify a finding that they were those seen and called for by the surveyor, however much they may be at variance with the courses and distances called for; nor is such charge justified by the further fact that such finding would make the quantity of land embraced within the survey much smaller than that stated." Of course, the same rule would apply where the acreage was greater. Furthermore, this case disposes of the supposed mistake of the surveyor in making up the calls of the 315-acre Snyder tract. The top of the mountain is in existence, and this being true the

theory of a mistake to avoid the mountain is not, in my opinion, tenable. See also *Higuera* v. *U. S.,* 5 Wall. 827, 18 L. Ed. 469; *Elliott* v. *Horton,* 28 Gratt. 766; *Norfolk Trust Co.* v. *Foster,* 78 Va. 413.

Next, and finally to be considered, are the decisions of this Court. In *Adams* v. *Alkire,* 20 W. Va. 480, this Court, speaking through Judge Snyder, recognized the Virginia rule on the question of boundaries, saying: "In the description of lands or questions of boundaries the rule is settled in Virginia and this State that natural landmarks, marked lines and reputed boundaries will control mere courses and distances or mistaken descriptions in surveys and conveyances," citing and discussing the Virginia case, and in the syllabus there is this statement of the law: "Where a deed contains a general description of the land conveyed which can be made certain by proof of the surrounding circumstances, or identified by reference to the land itself or other objects that, more or less distinctly indicate or determine it, and such deed also contains courses and distances of the land; such general description, if it satisfactorily appears from the deed itself or any recital, or writing referred to, therein, that it was the intention of the grantor to convey the land so generally described, will control, and the courses and distances, in so far as they limit or differ from such general description, will be disregarded." In *Gwynn* v. *Schwartz,* 32 W. Va. 487, 9 S. E. 880, it was held: "In the description of lands as to questions of boundaries the rule is settled in Virginia and West Virginia that natural landmarks, marked lines and reputed boundaries will control mere courses and distances or mistaken descriptions in surveys and conveyances," and "The statement of the quantity of land supposed to be conveyed and inserted in deeds by way of description, must not only yield to natural landmarks and marked lines, but also to descriptions in deeds by courses and distances." In *Matheny* v. *Allen,* 63 W. Va. 443, 60 S. E. 407, 129 Am. St. Rep. 984, it was held: "It is a general rule that, in locating boundaries of land, resort is to be had first to natural landmarks, next to artificial monuments, then to adjacent boundaries, and last to

courses and distances." In *State* v. *King,* 64 W. Va. 546, 63 S. E. 468, 469, this Court said: "Quantity, courses and distances, mentioned in the description of land, must yield to identified monuments, where there is conflict; and mere conflict in the evidence, as to the identity of monuments, does not preclude the application of this rule; it being the duty of the court or jury, as the case may be, to determine, from the evidence, whether the objects in question are the monuments called for." In *Wiley* v. *Hatcher,* 70 W. Va. 92, 73 S. E. 245, we held: "In locating the boundaries of land, ordinarily the course of a line must yield to a call for a natural monument," and "a call in an ancient deed for 'two white oaks on Cooper's point' must control over a course given for the line which will not take it to Cooper's point, when the location of that place is definitely established, though the trees are not found there." That case, it seems to me, should be decisive of the case at bar. "Two white oaks on Cooper's point" is less specific as to the location of the monument called for than is a description of a monument at the terminus of a line called for on "the top of said mountain." The mountain referred to was there when the call was formulated, and is there now. All that needs to be done in the matter of location is to run the line called for on a given course until the top of the mountain is reached. The presence of the thorn called for would have been added evidence of the exact location of the corner, but its absence does not destroy the more enduring and satisfatory monument, the top of the mountain. There is satisfactory evidence that the thorn called for at that point once stood there, but it is not necessary to rely thereon. So says *Wiley* v. *Hatcher.* A question might have arisen as to where on Cooper's Point the two white oaks were located, but it being said that it was a sharp point, such question may not have been important, but certain it is that even a sharp point is not a more definite location than the top of a mountain at a point where a given line reaches that elevation. I do not think the case of *Wiley* v. *Hatcher* can be substantially distinguished from the case at bar. Even as late as 1938, in *Conner* v. *Jarrett,* 120 W. Va. 633,

200 S. E. 39, we adhered to the settled rule governing natural monuments. In that case, a stream was involved, but whether it be stream, ridge or mountain, the rule governs, and monuments of such nature, and monuments of lesser dignity, prevail over courses and distances, and acreage called for.

But say the members of the Court constituting the majority, it is not necessary to go to the top of the mountain, because near the end of the 100-pole line from the two beeches at "A" there is found a tree, a spruce, marked as a corner and located at "B" on the trial map. This is in or near the line called for as having its terminus on top of the mountain, and the markings correspond with the date when this line was originally run. But for the corner markings no significance would be attached to this tree. However, it is said that the markings indicate that the line turned from the course of N. 45° 30′ W. to S. 64° W. to a point at "C" where a sugar, cherry and beech pointers, and a painted rock were found, and a bunch of thorns near. This point is on the top of the mountain. Therefore, say the majority, this is the top of the mountain the surveyor had in mind, and when he called for this point at the end of the 100-pole line he made a mistake, which we at this late day should correct. This assumption of a mistake is one of the principal contentions relied upon to support the majority opinion. They say, also, that someone, no one knows who, entered a statement on the surveyor's book— "This Plott was rong." They overlook the holding in *Reusen* v. *Lawson, supra,* which is that the surveyor's book is not admissible to change the grant, and certainly a notation thereon should not be given any weight whatever; they say there are markings along the line from "B" to "C," but they do not correspond in age to the corner markings at "B." They say that running from "B" to "C" instead of from "B" on the top of the mountain at "7," will give to the defendants the acreage called for in the Snyder tract, and that the survey will close, and they use these arguments, as well as others, to support their view that the call for the top of the mountain should be ignored. I do not believe these considerations should pre-

vail over what I have endeavored to show is the long prevailing and established rule, and I think the fact that not a single one of the trees found at "C" is called for in any title paper read in evidence, and no thorn found at "B" lessens their force. True a spruce was found at "B," and, by reference to the dictionary, this is said to represent the yew called for, but it is not on top of the mountain. The position of the majority is, in my judgment, based largely on conjecture of what was in the mind of the surveyor. The majority opinion, in referring to what the official surveyor did, frequently states that he assumed that the older surveyors meant or did certain things. The theory of the plaintiff's case, in my opinion, rests too much on assumptions and conjecture. I do not believe natural monuments should be disposed of in that fashion. I say that the original surveyor meant to go to the top of the mountain because he said so; the majority say he meant to stop 1890 feet short of the top of the mountain and 467.11 feet below, by surface and perpendicular measurements, respectively, merely because a tree marked as a corner was found at that point, and running a line at approximately right angles from the 100-pole line, trees, not called for in any title paper, were found at another point on the top of the mountain, and because elements of acreage and the closing of the survey more nearly conform to those called for in the survey. I have not entered into the conflicting evidence as to the location of thorns at "C" or at "7." There may have been thorn trees at both points. They are not there now; but the top of the mountain is there, both at "7" and "C." The calls of the deeds which plaintiff put in evidence say the top of the mountain should be reached by running a straight line from point "A" on the trial map, admittedly a correct corner, to the top of the mountain, and not otherwise, and I remain unconvinced that the evidence and circumstances of this case justify what I consider is a marked departure from fundamental law governing the location of boundaries of land, as it has been heretofore applied in Virginia and this state from their very foundation. Rules of law, such as these, affecting as they do our most substantial and

enduring form of property, should not be lightly cast aside to serve the exigencies of a particular situation. The land involved in this dispute is on or near the top of one of our highest mountain ranges, was probably of little value in 1846, when the Logan patent was issued, or when Barton acquired the adjoining land. Only the developments of more recent years have given substantial value to this property. In those early days acreage was not so important, and lines were not run with exactness as to either course or distance; therefore, the safe rule is to recognize established, fixed and enduring natural monuments, regardless of other and less satisfactory evidence of location, and regardless of resulting consequences to the litigants involved.

The rule governing the location of boundaries of land, for which I contend, has served us well during the period in which such boundaries have been largely settled in this state. Now the occasions where it is invoked are rare, but in those rare instances I see no reason to depart therefrom, merely to serve a case where, in the opinion of a majority of the Court, the application thereof will produce a result from which it shrinks. No general rule is ever applied in strictness, without producing results, which, in some instances, we would like to avoid. The result of a reversal of the judgment of the lower court in this case produces a result which the majority thinks should be avoided, and to avoid the same it seeks to find a way to produce the result it feels will be just to the litigants involved. I do not share the views of the majority as to the injustice of the result for which I contend, but if I did share such views, I would still contend for the rule which, for more than a century, has been one of the landmarks of real estate law in Virginia and this state, because, as I believe, therein lies the safe and sound course, and one which in almost every case will produce equitable results. That, in rare instances, its application may produce what someone thinks is an unsatisfactory result should not destroy the rule. But is injustice done by the application of the natural monument rule to this case? True, the defendants will gain 212.92 acres of land

in excess of the acreage named in the conveyance under which they claim. This is not unusual where, to reach monuments, lines are lengthened, and the converse is true where, in such circumstances, lines are shortened. Acreage is calculated from course and distance, and if they are, in the light of established monuments, incorrect, the true acreage ascertained from corrected courses and distances, follows as a matter of course. There is nothing new, uncommon or important in this situation. The exact number of acres which the defendant gains over the estimated acreage, by the application of the rule for which I contend, the plaintiff gains by the decision of the majority. The matter of acreage in this case is unimportant, and is never considered of major importance, unless it be where confusion exists as to two monuments of equal dignity, in which case the acreage called for in a grant or conveyance becomes important in determining which of the two monuments shall be recognized. "A statement of quantity is regarded as the least certain mode of describing land, and is never allowed to control defined and reliable calls by monuments, courses and distances. All other elements of description must lose their superior value through ambiguities and uncertainties before resort can be had to quantity." 2 Va. & W. Va. Digest, 305, and cases there cited.

It is said that the lines of the defendants' land as contended for by the plaintiff will close, or nearly so; while under the claim of the defendants the survey will not close. This is true. Inevitably, a lengthening of the 100-pole line from "B" to the top of the mountain will call for the lengthening of other lines to reach monuments called for. There is nothing startling about this. It has happened before. It is merely following the logic of the situation. If the line in question runs to the top of the mountain, then, necessarily, lines must be run from that point to other monuments called for, and that they may be longer or shorter, or a different course, from those called for is of no particular consequence. If we must go to the top of the mountain the lines from that point must be made to conform to monuments, courses, and distances

necessary to reach the beginning corner of the survey. It is simply a case of facing facts. If the true corner of the defendants' land is on top of Cheat Mountain, we should not shrink from giving to that fact its logical consequences, even though it involves an increase of acreage or a lengthening of lines, or the changing of the courses thereof.

I do not think that the question of boundary here involved is affected by the fact that there was a demurrer to the evidence. While it is true that on a demurrer to the evidence all reasonable inferences which can be drawn from all the evidence introduced, should be considered in the light most favorable to the demurree, this case does not, in my opinion, lend itself to inference in favor of either party. The plain question before the court was whether the top of Cheat Mountain should be recognized. That the mountain is there, and that there is a point which can be called the top of the mountain, and that this point is plainly called for in deeds, patents and surveys introduced by the plaintiff, and their correctness vouched for, is undisputed. Where then, is there any place for inferences in favor of the demurree? The question of whether the terminus of the line running from point "A" on the trial map was at "B" or "7," was a question of law for the court. "What are the termini or boundaries in a grant or deed is a question of law; but where the termini or boundaries are located is a question of fact, for the jury." *Grief* v. *N. & W. Ry. Co.* (Va.), 30 S. E. 438, 2 Va. Dec. 600. See also, *Bradley* v. *Swope*, 77 W. Va. 113, 87 S. E. 86, where it was held: "Where the location of boundary lines are not uncertain or indefinite but depend upon the construction of a deed, calling for the lines of an abutting owner as a part of the boundary, the question is one of law for the court to determine." I contend that it was for the court to say whether, under the calls in the title papers introduced in evidence, the line in dispute should or should not run to the top of the mountain, and that it should have held that the terminus of said line was the top of the mountain. The trial court held to the contrary, and in my judgment, committed error which should be corrected by this Court.

I am authorized to state that Judge Lovins concurs in this dissent.

KENNA, JUDGE, concurring:

The decision of this case turns upon the location of the terminus of the following call in the defendants' title papers, the call dating back to the grant under which defendants hold: "2 beeches and a number of pointers between 2 small drains Thence S. 50° E. 100 poles to a Thorn and yew and beech pointers on the top of said mountain." If this language means that the exact top of Cheat Mountain is the called-for corner, the demurrer of the defendants to the evidence should be sustained: if not, plaintiff has shown good title to the land in controversy, and the demurrer to the evidence should be overruled.

In executing an order of survey, the thorn, yew and beech pointers were not found, nor was anything found indicating their location on the ground. The top of the mountain is a sizeable flat surface on which levels had to be taken a dozen times (the mistakes made in the use of surveying instruments being the main reason for subordinating bearing and distance to monuments, supposedly locatable without their use) in order to locate the highest point. Under those circumstances, I do not believe the top of the mountain should be regarded as a monument of any sort, but at best from defendants' viewpoint should be taken as nothing more than a general landmark intended to assist in locating the called-for corner. When that, coupled with the admitted fact that in order to reach that now located point (top of the mountain), the distance named in the call must be practically doubled with certain known natural monuments disregarded, is considered, I do not believe that the defendants have succeeded in locating a monument which should control over bearing and distance.

That there is a mistaken distance in the call under discussion is a part of the defendants' contention and, therefore, I am under the impression that the plaintiff was fully justified in taking the position that the bearing and

distance is not a mistake as the defendants are forced to contend, but that the mistake in the admittedly inconsistent call is in describing the thorn and yew with the beech pointers as being "on the top of said mountain." When there is conflict between established bearing and distance and controverted corners, certainly proof *aliunde* the instrument is proper.

Both the majority opinion and the dissent go thoroughly into the evidence and it is unnecessary that it be repeated even partially. All references herein made to the evidence give plaintiff the benefit of conflicting testimony and all fair inferences from facts in that way, or otherwise, established. I am of the opinion that this discussion of the defendants' demurrer to the evidence should center upon determining the manifest intention of the parties to the numerous deeds under which the defendants hold and the evidence of those familiar with the boundaries on the ground which may be taken as a practical construction of the language of the grant which gave rise to the defendants' title.

We must not lose sight of the fact that the definitely settled rules of construction by which the description of land contained in a deed is located on the ground, preferring natural monuments over bearing and distance, are used when, and only when, their use is rendered necessary in order to arrive at the intention of the parties to the deed or to clear an ambiguity concerning their purpose. I cannot agree with Judge Fox's statement that the preference accorded natural monuments, admitting their high rank, under this rule is "the fundamental law governing the location of boundaries of land." Admitting the solemnity to be attached to a deed, it seems to me to be plainly apparent that we are here dealing with adjective law or rules of construction—not rules of property. See 16 Am. Jur. 528, paragraph 161. The intention is the governing criterion, and a rule of construction that conflicts with the manifest intention of the parties is to be entirely ignored. Code, 36-3-4. As rejecting a *beginning corner* as having been selected by mistake and *inconsistent with the other matter of description in the deed*

and hence contrary to the manifest intention of the parties, see *State* v. *Herold,* 76 W. Va. 537, 85 S. E. 733, by a divided court. As approving an instruction which told the jury to disregard evidence of marked corners and to consider bearing and distance instead, see *Tolley* v. *Pease,* 72 W. Va. 321, 78 S. E. 111. This case is, apparently, decided upon a theory entirely different from, if not directly contradictory to, that which controlled *Watkins* v. *King,* 118 F. 524, 55 C. C. A. 690, decided thirteen years before the *Tolley* case and quoted by Judge Fox. For a sound discussion of the fact that manifest intention of the parties controls the construction of deeds, see *Mylius* v. *Lumber Co.,* 69 W. Va. 346, 361, 71 S. E. 404. See also, *Casto* v. *Baker,* 59 W. Va. 683, 53 S. E. 600. The case of *Goff* v. *Goff,* 78 W. Va. 423, 89 S. E. 9, goes so far as to hold that where the language indicates clearly that the parties are mainly interested in conveying a given acreage, quantity is the controlling element and governs the location of the closing line between two named points to the extent of curving that line instead of running it straight. The opinion of Judge Snyder in *Ruffner* v. *Hill,* 31 W. Va. 428, 435, 7 S. E. 13, distinctly states the controlling effect of intention when it is a matter of deciding whether distance or course is to be preferred. As I read Judge Snyder's opinion in the case of *Adams* v. *Alkire,* 20 W. Va. 480, cited by Judge Fox, the holding is that intention is the governing criterion as compared with settled rules of construction, and, therefore, in the matter then before the court, metes and bounds, as specific description, gave way to a general description of the tract conveyed.

I cannot accord to the Virginia cases the same controlling effect since the separation that they had before, but I do not believe that there is the slightest difference in the discussed doctrines now adhered to there and here. Mr. Minor in his valuable work, "Real Property," has this to say concerning the effect to be given to intention in construing the language of a deed:

"The purpose is to make out the boundaries by mathematical lines, and to this end *monu-*

*ments* are not essential, though very useful for the purpose of correcting defective measurements. Usually, both monuments and courses and distances are employed, and if there be any irreconcilable divergence between them, the courts will look to the *intention* of the parties, so far as it can be ascertained, to determine which should prevail. But in the absence of evidence of intention on this point, the general presumption is that a call for *fixed monuments* is to take precedence over inconsistent calls for *courses and distances* upon the theory that the former are more apt to have been in the minds of the parties than mere imaginary mathematical lines.

"So, also, there being no monuments, in case of a conflict between the *distance* of one line and the *course* of another, the general rule is that the *intention* of the parties shall control, and no arbitrary rule can be laid down that the distance must yield to the course, or *vice versa.* Perhaps, however, in the absence of any positive evidence of intention, a presumption may arise in favor of the *course* over the *distance,* upon the theory that chain carriers are more likely to make mistakes in measuring the distance than the more skilled and experienced surveyor is in ascertaining the course in surveying land." 2 Minor on Real Property (2d Ed.), pp. 1418, 1419. (Italics in original text).

(Those sufficiently interested will do well to examine the cases cited in the comprehensive footnotes to the text.) As illustrating that in all other jurisdictions rules of construction give way before the manifest intention of the parties in preferring general description to particular description, see the annotation in 72 A. L. R. 410, referring to three West Virginia cases on pages 422 and 423.

From the foregoing authorities, I reach the conclusion that natural monuments, even where found, and here they are not, do not control over the intention of the parties to a deed that can be ascertained from the face of the instrument.

What, then, appears from the face of the description in the defendants' muniments of title? With the corner lo-

cated according to the defendants' contention three things occur: (1) Distance of the call to the corner is extended to more than double the named length; (2) the grant under which defendants hold fails to close by approximately the added distance or by over sixteen hundred feet; (3) the acreage of the defendants' tract is increased by two-thirds of its size, and plaintiff's reduced accordingly. As fallible as men are, I do not think a normal intent under any circumstances would be to make one mistake of the magnitude common to the three blunders that would occur on the defendants' theory, and certainly on that theory the entire outcome would conflict with normal comprehension. I believe that it is certainly a reasonable, if not an inescapable, inference that no grantor would intend to warrant the title of land so described. These facts, discoverable from the face of defendants' title papers, coupled with all of the surrounding circumstances, among which are that upon plaintiff's theory the distance of the call corresponds with marked timber, the annulations of which agree with the date of the survey; the survey may be said to close for all practical purposes; and the acreage of both the defendants and the plaintiff is accurately named in the deeds under which they claim; cause me to believe that with intention controlling, the trial judge correctly overruled the defendants' demurrer to the evidence and entered judgment for the plaintiff.