ELEANOR NILAND *v.* MONONGAHELA WEST PENN PUBLIC SERVICE COMPANY *et al.*

(No. 9291)

Submitted October 20, 1942. Decided December 15, 1942.

232

*Harry Shaw,* for plaintiff in error.
*Ernest R. Bell,* for defendant in error.

RILEY, JUDGE:

In this action of trespass on the case instituted by Eleanor Niland (now Higgins) against Monongahela West Penn Public Service Company for recovery of damages for personal injuries sustained by her on August 2, 1924, in a collision between an automobile owned and operated by William E. Gregg, in which plaintiff was riding as a guest passenger, and defendant's trolley work car, the Circuit Court of Marion County overruled a demurrer to the evidence interposed by defendant and entered judgment for plaintiff upon the jury's conditional verdict of $8,000.00. Defendant now prosecutes this writ of error to that judgment.

This action was heretofore considered by this Court in 1926 (see 106 W. Va. 528), wherein defendant was awarded a new trial here because the evidence did not sustain a charge of negligence against defendant. In the sixteen years which have elapsed since the case was here, there have been two trials. The first thereof (1931) resulted in a jury verdict of $4,500.00, in plaintiff's favor, which on

March 16, 1935, was set aside and a new trial awarded defendant. The judgment resulting from such third trial is now before us for determination.

A demurrer to plaintiff's evidence was interposed after both plaintiff and defendant had concluded their testimony; and since our appraisement of the trial court's judgment in overruling the demurrer to the evidence involves a sharp conflict in the views of litigants' counsel as to what evidence may properly be considered upon such demurrer, that question is primal and is answered in two recent pronouncements of this Court, wherein it was held that:

> "Upon a demurrer to the evidence all the evidence introduced at the trial should be incorporated in the demurrer, and will be treated as being so incorporated where, upon such demurrer by the plaintiff, it appears that the court, in passing upon the demurrer, considered all the evidence for the defendant, and all the evidence for the plaintiff not in conflict with the competent evidence for the defendant."

*Conner* v. *Jarrett,* 120 W. Va. 633, Pt. 3, Syl., 200 S. E. 39; *West Virginia Pulp & Paper Co.* v. *J. Natwick and Co.,* 123 W. Va. 753, 21 S. E. 2d 368, Pt. 1, Syl. The rationale for such principle is expressed in *Bowman* v. *Dewing & Sons Co.,* 50 W. Va. 445, 40 S. E. 576, thus: "* * * if the Court would not set aside such verdict on consideration of the whole evidence, it should overrule the demurrer and enter judgment for the demurree."

The record is a voluminous one, and covers both the charge of negligence of defendant, as well as its assertion that plaintiff herself was guilty of contributory negligence thereby barring her right to recover. The relevancy of the latter position becomes pertinent only in the event that defendant was primarily negligent. That is the basic question and we shall deal with the factual situation presented by the record upon that issue.

The collision occurred on the "Country Club Road" between Clarksburg and Fairmont at a point known variously as "Fleming Crossing", "Packard Garage Crossing", and "Country Club Crossing", where defendant's trolley

tracks intersect the highway. The crossing, according to plaintiff's witness, is twenty-one feet long, whereas, defendant's witness testified that it was eighteen feet long. Approaching the crossing from Clarksburg, the direction from which the Grant sedan, in which plaintiff was riding, came, plaintiff's witness, D. Fred Talbott, a civil engineer, testified that the highway at Goose Run, a distance of 200 feet from the crossing, is practically level for a distance of fifty feet; that there is then an ascending grade of 3.6 per cent for a distance of fifty feet, and from that point to the crossing, a distance of one hundred feet, the grade is an ascending one of 6.2 per cent, while the grade of the crossing itself is "practically level". On the day of the accident there were two routes from the crossing into Fairmont: one route (known as the "Twelfth Street") traversed the crossing, and the grade of the highway thereover, according to defendant's civil engineer, was 9.59 per cent, while Plaintiff's witness estimated it at 10 or 12 per cent; and a second route (known as "Locust Avenue") did not involve the crossing from the direction of Clarksburg, but it led to the left just before reaching the crossing. Defendant's tracks parallel the Locust Avenue route, and a trolley car, approaching the crossing from the direction of Fairmont, going toward Clarksburg (the direction from which the work car was being operated) would be on a descending grade of 3.5 per cent.

The paved portion of the Country Club Road as it approached the crossing was fourteen feet in width, while Locust Avenue was sixteen feet wide. A building, occupied by the Cadillac Garage, was located in the angle formed by the Country Club Road and Locust Avenue Route, facing the latter, and was situate about sixty feet from the nearest side of the crossing. It tended to obstruct the view of an automobile going towards Fairmont from the Clarksburg side of the crossing, although as defendant's witness Schimmel testified, a motorman on a work car going in the direction of Clarksburg and approaching the crossing from the Fairmont side had a view of the highway two hundred feet from the crossing and from a point on defendant's tracks seventy-four feet from the crossing

there was nothing to obstruct the view of the highway for one hundred fifty feet. Defendant had placed a signal bell, located between the crossing and Twelfth Street, 17.3 feet from the center of the crossing, and 8.8 feet from the Fairmont edge thereof, and on the post where such bell was located there was also a sign in white letters reading "Railroad Crossing" and ten electric lights. There was also a detour sign on a pole on the right side of the road just before entrance upon the crossing from the Clarksburg side thereof.

The work car involved in this accident was thirty feet, nine inches long, and nine feet, four inches wide. On the rear platform thereof there was a cab seven feet long, four feet wide, and on each side thereof were two stationary windows, as well as a door with a stationary window in the front of the cab, and a door at the rear thereof. As the work car proceeded toward the Fairmont side of the crossing, the controller box thereof was on the left side of the cab while there was a seat on the right side thereof. On the platform of the work car in front of the cab were four or five rows of switching ties, each being nine inches wide and seven inches thick.

Plaintiff, a resident of West Brownsville, Pennsylvania, was one of a party of nine persons who had taken an automobile trip of more than fifteen hundred miles, and had journeyed through Pennsylvania, Maryland, Virginia and West Virginia. They had toured in two passenger automobiles, and on the day of the collision the party had left Clarksburg about 11:30 a. m., travelling towards Fairmont. Six members of the party rode in a Studebaker, while plaintiff, as a guest passenger, rode in the Grant sedan with Inez Gregg and her father, William Gregg, who was driving the car which collided with defendant's work car about 1:30 in the afternoon.

Defendant's work car (known as a flat car) operated by motorman C. Ray Miley, had proceeded from Edgemont Junction toward Clarksburg. On the work car with Miley were Charles Stout, the conductor, who, according to Miley, stood in the rear of the cab as it proceeded toward the crossing, while on the platform of the car and in the

center thereof, stood Frank Delgrosso, general foreman of maintenance of way, and two other employees of defendant, who sat on the cross-ties. Miley testified, and his testimony is not disputed, that on leaving Edgemont Junction he used "a little power to start the car in motion"; and after travelling from twenty-five to fifty feet, he shut the power off and did not again turn it on at any time before the work car was brought to a stop immediately after the collision. He places himself in a standing position at the controller box, and contends that he continued to look toward the crossing at all times as the work car approached it. His version is that he first looked to the right, then to the left, and again to the right in the direction of the Country Club Road when he saw an automobile approaching, and about the same instant in which he saw this automobile he heard Frank Delgrosso call, "Look out, Ray". When he saw the automobile it was, according to his testimony, between thirty and forty feet from the crossing as the car approached from the Country Club Road. He says that after he saw the automobile he "threw the air on in emergency", "grabbed the whistle cord" and "jerked it a number of times". He admits he did not use the foot gong because "We only use them in the city", and, further, because the whistle makes a louder noise than the foot gong. Miley asserts that on the occasion the signal bell at the crossing was ringing; that at a point 722½ feet east of the crossing "in the Fairmont direction" there is a contact point on the trolley, which causes the bell to ring when the trolley wheel passes over it; that before going through this point, and probably 150 or 200 feet below it, there is a light on a pole which, when burning, is indicative that the lights at the crossing are likewise burning and that on the day of the collision the light on the pole was burning, denoting to him that the lights at the crossing were likewise burning. When Miley first observed the Grant sedan thirty or forty feet away from the crossing, he observed the front end of the work car was within five feet of the Fairmont side of the crossing. A collision between the two vehicles occurred on the cross-

ing, the impact of which completely demolished the automobile.

Plaintiff charges that the collision occurred because of four negligent acts on the part of defendant, namely: (1) That defendant was running the work car backwards; (2) that defendant operated the work car without a lookout; (3) that defendant failed to whistle or to ring the bell, as required by law; and (4) failure to stop the work car. We think the first two causes listed may be considered together.

When this case was considered by this Court in 1926, Judge Litz, speaking for the Court, in his opinion says: "We would infer from the language in the declaration that what plaintiff intended to charge was that the defendant failed to keep a proper and sufficient lookout through its trainmen. The motorman of the work car testified that as soon as the road over which the Gregg car was travelling became visible to him, he looked in that direction and saw no car approaching; he then looked to the left (in the direction of the bridge), and that just as he was swinging his vision back to the right he heard one of the train crew call 'Look out, Ray'. He then saw the Gregg car about 30 or 40 feet away from the crossing. This evidence is not controverted. It shows affirmatively that a proper look-out was being maintained by the defendant."

We think that the Court is bound by the conclusion of this Court in the prior decision, unless there is additional evidence in the present record from which it can be said that a proper lookout was not being maintained. *Keller* v. *N. & W. Ry. Co.*, 113 W. Va. 286, 167 S. E. 448. Counsel for plaintiff points to the testimony of Virginia Niland, driver of the Studebaker car, which had reached the crossing some five or ten minutes prior to the time of the collision and had turned on Locust Avenue about forty feet from its intersection with the Country Club Road. She contends that three members of the party were seated in the rear seat of the Studebaker with John Gregg sitting on the right side thereof holding her baby, and that several of defendant's employees, including motorman, Miley, continued to wave at the child as the work car passed along

the side of the Studebaker. She says that the "man in the cab continued to wave until the car got by", out of her sight. It is significant to observe that this testimony had not been adduced at the first trial, nor is there any corroboration of her testimony by any of the other occupants of the car, and especially by John Gregg who testified that he was showing the baby the street car. Furthermore, her testimony is contradicted by Miley. It is indeed strange that Virginia Niland, a sister-in-law of plaintiff, would not have disclosed such information to plaintiff when her case was first tried, and we are not persuaded by her testimony, in the subsequent trial in the face of contradiction by the motorman and lack of corroboration by those who were in the car with her when she asserts that the waving took place.

The witnesses are not in agreement in their testimony relating to the blowing of whistles by defendant's motorman, the ringing of the bell located on the post at the crossing, or the burning of lights at the same point. Plaintiff and her host driver say they did not hear the bell or see the lights burning at the crossing, yet Phillip Erwin, one of plaintiff's witnesses heard the bell at his home about eight hundred feet from the crossing and at the time of the collision. We think the testimony clearly preponderates in favor of defendant's contention that the warning signals were given at the time the Grant sedan approached the crossing. The opinion in the first consideration of the case is apt in its statement that, "It therefore appears that the defendant had taken more than the usual precautions as to this crossing in that it had provided signals which would appeal to the sense of sight as well as the sense of hearing."

Having thus far absolved defendant from negligence, we next inquire into the merits of the fourth cause of the accident asserted by plaintiff, namely, the failure to stop the work car.

It is unequivocally established that the work car was not being operated at a fast rate of speed. Virginia Niland estimated the speed at five or six miles per hour; Delgrosso stated that it was drifting at eight mlies per hour, and

Miley's report to his company, concerning the accident, showed that his estimate of the speed was from six to ten miles per hour, although his testimony in the record before us is that it was going at a rate of eight to ten miles per hour. This latter estimate is corroborated by John Gregg, one of plaintiff's witnesses, who sat in the Studebaker car at the time of the collision. In the prior opinion, Judge Litz, speaking for the Court, observed that, "Even expert testimony in favor of the plaintiff does not show that the railroad car could have been stopped in less space than it actually was stopped." To supply this omission, five witnesses, each of whom had been an employee of defendant and had operated the same work car involved in this accident, and several had operated it during 1924 over Fleming Crossing, testified on plaintiff's behalf that the work car, by use of the emergency application of brakes, could have been stopped within a distance varying from four to twelve feet, if driven at the rate of six miles per hour; within a distance varying from six to sixteen feet, if driven at the rate of eight miles per hour; and within a distance varying from ten to twenty-five feet if driven at the rate of ten miles per hour. These estimates are disputed by witnesses for defendant, who estimate the car could have been stopped within a distance varying from fifteen to thirty-five feet, if operated at six miles per hour; within a distance varying from twenty-two to forty-five feet, if operated at eight miles per hour; and within a distance varying from forty to sixty feet, if operated at ten miles per hour.

We are fully cognizant that where the evidence is conflicting and that of the demurrant does not clearly preponderate, the rule is that the demurree's evidence must be considered as true. On the other hand, the truth of what plaintiff's witnesses assert as to the distance in which the work car could have been stopped is challenged in the record before us by the circumstances of this particular experience. Defendant's witness Miley stated that the front of the work car was within five feet of the crossing on the Fairmont side. The work car had travelled between one-half and two-thirds of the crossing when the collision

occurred; and considering the evidence that the crossing was between 18 and 21 feet in length, it is estimated that the work car travelled a distance between fourteen and nineteen feet after Miley observed the Grant sedan and at the time of impact. According to plaintiff's exhibit No. 7, an object travelling five miles per hour covers 7.333 feet per second, while one travelling six miles per hour covers 8.800 feet in the same period of time. We have used these two examples because they are the slowest estimates of speed asserted by any of plaintiff's witnesses and thus afford the longest period of time to elapse between sight of the car by Miley and the time of impact. Hence, at most an interval of three seconds passed. Delgrosso, whose testimony in this case was introduced by plaintiff, testified that when he called to Miley the work car was already six feet on the crossing. If we accept as correct his placement of the work car, not even two seconds could have intervened. Competent motormen may not be in harmony of opinion as to the distance in which the work car should have stopped, but it is clear and beyond dispute that this accident occurred too quickly to afford defendant's motorman an opportunity to avoid the collision. All of plaintiff's witnesses, among whom there is contrariety of opinion as to the distance in which the work car should have stopped, would have proceeded in the manner in which Miley did upon discovery of the automobile; and while some of them say they would have thrown the car in reverse afterwards, at least one admits that at least four seconds of time would be essential to those operations, and one of them admits that if the work car had been six feet on the crossing, as Delgrosso stated, nothing could have been done to avoid this collision.

In the appraisement of this case we have not overlooked the fact that the evidence contained in the record when the case was here sixteen years ago, as shown by Judge Litz' opinion, in many instances does not differ materially from the instant record. True, the five former employees, called by plaintiff, did not testify at the first trial, and it is largely upon their testimony that plaintiff's counsel seeks to take this case out of our former holding. These wit-

nesses did not testify from any observation of the collision. Their testimony was responsive to hypothetical questions. While it is true these men, as former operators of the work car, qualified themselves to testify as to the procedure they would have used to stop the car, under the conditions portrayed by this record, there is such a variance of opinion among them as to the distance within which the car could be stopped that, considered with the other evidence in the case, we believe their testimony does not rise beyond the height of mere conjecture and estimate. While mathematical certainty is not a prerequisite to probative effect of expert testimony, the testimony of these witnesses, in our opinion, is not of sufficient probative force, considered in the light of the former holding of this Court, for us to say that, applying the rules governing demurrers to the evidence in *Conner* v. *Jarrett, supra,* and *West Virginia Pulp & Paper Co.* v. *J. Natwick & Co., supra,* the trial court was justified in overruling the demurrer to the evidence. We say this because we think that applying in plaintiff's favor the liberal rules governing demurrers to the evidence, plaintiff nevertheless has not borne the burden of proving that defendant was guilty of primary negligence, a requirement under the holdings of the two last-mentioned cases. If this case had been submitted to the jury on the question of defendant's negligence and a verdict rendered in plaintiff's favor, we would have been required to set aside the verdict as being contrary to the evidence. That being so on a demurrer to the evidence, the demurrer should be sustained.

The record shows that the original action was against both defendant public service corporation and William E. Gregg and that the latter did not complain here of the judgment rendered against him in the first trial of this case. Having concluded that there is no showing of negligence chargeable to defendant, we do not deem it necessary to detail herein the testimony relating to defendant's charge that plaintiff was guilty of contributory negligence such as to bar her from recovery.

On reversing the judgment of a trial court in overruling a demurrer to the evidence, this Court may sustain such

demurrer and enter judgment here in demurrant's favor. *Muhleman* v. *National Insurance Company,* 6 W. Va. 508, 524.

While the foregoing disposes of the case, we deem it advisable to discuss herein the instructions as a means of aiding trial courts in cases involving demurrers to evidence where both litigants have introduced testimony. Plaintiff's instructions B and C, given by the trial court, would permit the jury to accord plaintiff "all inferences favorable" to be drawn from her testimony, while defendant's instructions 5 and 6, refused by the trial court, would have required the jury to consider the evidence adduced by the defendant, as well as that of plaintiff, and defendant's instructions 8 and 8-A, likewise refused, would have told the jury that by its demurrer to plaintiff's evidence, it did not waive "any of its competent evidence, nor any of its evidence that conflicts with the evidence of the plaintiff", if the jury believed that defendant's evidence, so conflicting, was manifestly preponderant. In every action involving a charge of negligence for personal injury, two issues are involved: (1) Whether there is liability or fault on the part of a defendant, and, (2) the amount of damages which defendant, if legally at fault, must pay because thereof. Upon a demurrer to the evidence there is withdrawn from jury consideration the question of liability or fault and it becomes a question of law for the court; but there still remains for jury determination the quantum of damages. The demurrer to the evidence does not concern the latter inquiry, and logically, therefore, the jury must consider that question from the testimony given on behalf of both litigants, and without regard to any "inferences favorable to" plaintiff, which is peculiarly a rule involved in a demurrer to the evidence. The issue of damages must be determined as if there had been no demurrer to the evidence involved.

The judgment of the trial court is reversed, defendant's demurrer to the evidence sustained and judgment entered here in defendant's favor.

*Reversed; demurrer sustained;*
*judgment here.*